**Ronald Donell BROWN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–04–00519–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 23, 2005.

Rehearing Overruled Jan. 4, 2006.

Mike DeGeurin, Foreman, DeGeurin & Nugent, Houston, TX, for Appellant.

Charles A. Rosenthal, Jr., District Attorney–Harris County, William J. Delmore, III, Chief Prosecutor, Appellate Division, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

SHERRY RADACK, Chief Justice.

A jury convicted appellant, Ronald Donell Brown, of aggravated assault on a public servant, and the trial court assessed punishment at 30 years' confinement. In three issues, appellant contends (1) the trial court should have instructed the jury on the offense of reckless driving, (2) the trial court violated appellant's rights under the Sixth Amendment to the U.S. Constitution and Article 1, Section 10 of the Texas Constitution by refusing to replace a juror with an alternate, and (3) the trial court erred by admitting extraneous offense evidence under Texas Rule of Evidence 404(b). We affirm.

## BACKGROUND

In January 1997, appellant approached Kerry Carter and told Carter he could make $1,000 for every kilo of cocaine he helped appellant sell. However, unbeknownst to appellant, Carter had been a police informant for about seven years. Carter alerted police of appellant's plan and, together with the police, arranged for a sale to take place at the Amtrak train station in downtown Houston. Carter accompanied appellant to the Amtrak station to meet Officer Dennis, who was working undercover.

Carter introduced appellant to Officer Dennis, who displayed $84,000 cash, the agreed price for the five kilos of cocaine and twelve pounds of marihuana that constituted the sale. Upon learning Officer Dennis possessed the necessary money, appellant left to retrieve the drugs. Appellant returned to the station with only two kilos of cocaine, explaining that his supplier did not trust him with more. Officer Dennis agreed to this smaller purchase and told appellant to wait in the parking lot while he went inside the train station to retrieve the money. Shortly thereafter, Officer Dennis gave the bust signal to the other officers stationed nearby. Upon seeing the signal, the other officers moved in to arrest appellant. All the officers wore raid jackets with "POLICE" written in bright letters across the front and announced themselves as police officers.

Officers Ferrell and Robert parked in front of appellant's vehicle, while Sergeant Harrison and Officer Price parked behind appellant. Appellant then repeatedly drove back and forth ramming Officer Ferrell's car until he created enough space to drive past. Appellant then circled the parking lot at a high rate of speed.

As appellant attempted to leave the parking lot, he drove his vehicle towards Officer Ferrell, who was standing by the driver's door of his unmarked police vehicle. At this point, Officer Robert fired his gun, hitting appellant's windshield. Officers Ferrell and Robert testified that the gunshot caused appellant to swerve away from Officer Ferrell, saving his life. However, Officer Price testified that the gunshot caused appellant to lean to the right and that appellant merely sped off, without indicating that the vehicle swerved to the right or not. As a result of appellant intentionally and knowingly threatening Officer Ferrell with imminent bodily injury by using a motor vehicle, knowing that Officer Ferrell was an officer, appellant was charged with aggravated assault of a public servant.

At trial, after the close of evidence, the trial court granted appellant's request to instruct the jury on the lesser-included offense of deadly conduct. Appellant then requested an instruction on the offense of reckless driving, contending it too was a lesser-included offense. The trial court denied this second request, reasoning that reckless driving is not a lesser-included offense of aggravated assault.

### LESSER–INCLUDED OFFENSE

In his first point of error, appellant contends that the trial court erred by failing to instruct the jury on the offense of reckless driving as a lesser-included offense.

### Standard of Review

■ In determining whether a charge on a lesser-included offense is required, we apply a two-step analysis. *Feldman v. State*, 71 S.W.3d 738, 750 (Tex.Crim.App. 2002); *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim.App.1993). Under the first part of *Feldman* and *Rousseau*, a party must establish that the lesser-included of-

fense is included within the proof necessary to establish the charged offense. TEX.CODE CRIM. PROC. ANN. art. 37.09 (Vernon 1981); *Feldman*, 71 S.W.3d at 750; *Rousseau*, 855 S.W.2d at 672. Second, the record must include some evidence that would permit a jury to rationally find that, if guilty, the defendant is guilty only of the lesser-included offense. *Feldman*, 71 S.W.3d at 750; *Rousseau*, 855 S.W.2d at 672.

■ In determining whether any evidence exists in the record that would permit a rational jury to find that the defendant is guilty only of the lesser-included offense, anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. *Forest v. State*, 989 S.W.2d 365, 367 (Tex.Crim.App.1999). We review all evidence introduced at trial to determine whether the trial court erred in failing to instruct the jury on a lesser-included offense. *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex.Crim.App.2000); *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim.App.1994). Credibility determinations and conflicts in the evidence are not factors to consider in determining whether the trial court erred in failing to instruct the jury on a lesser-included offense. *Banda*, 890 S.W.2d at 60.

■ Applying this two-step analysis, we find that the elements of reckless driving are included within the facts required to establish aggravated assault as charged in this case. A person commits the offense of aggravated assault by intentionally or knowingly threatening another with imminent bodily injury and using or exhibiting a deadly weapon during the commission of the assault. TEX. PEN.CODE ANN. §§ 22.01(a)(2), 22.02(a)(2) (Vernon Supp. 2004–2005). In this case, the indictment charged that appellant did "unlawfully, intentionally and knowingly threaten with imminent bodily injury Samuel Ferrell . . .

while [Ferrell] was lawfully discharging an official duty, by using and exhibiting a deadly weapon, namely a motor vehicle, knowing that [Ferrell] was a public servant." A person commits the offense of reckless driving by driving a vehicle in willful or wanton disregard for the safety of persons or property. TEX. TRANSP. CODE ANN. § 545.401(a) (Vernon 1999).

The offense of reckless driving requires a "driving" and a "reckless" element. We find that the "driving" element of reckless driving is included in the facts required to establish aggravated assault in this case. Here, the "driving" element is encompassed in the indictment because the State attempted to establish that appellant used his vehicle as a deadly weapon in the manner that he drove it. The State's entire aggravated assault case rests on whether or not appellant intentionally or knowingly drove his vehicle at Officer Ferrell. *See Benge v. State*, 94 S.W.3d 31, 35 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd). Thus, the State was required to prove that appellant was driving a vehicle as an element of the aggravated assault charge.

We also hold that the "reckless" element of reckless driving is included in the facts required to establish aggravated assault. In the context of reckless driving, "willful and wanton disregard" means the "deliberate and conscious indifference to the safety of others." *Harris v. State*, 152 S.W.3d 786, 796 (Tex.App.-Houston [1st Dist.] 2004, pet. ref'd) (citing *Benge*, 94 S.W.3d at 36); *White v. State*, 647 S.W.2d 751, 753 (Tex.App.-Fort Worth 1983, writ ref'd). We agree with *Benge* that "one who intentionally and knowingly threatens another with imminent bodily injury has a deliberate, conscious indifference for that person's safety." *Benge*, 94 S.W.3d at 36. Further, if the higher culpable mental state of intentionally or knowingly is established, then it necessarily establishes the lower culpable mental state of recklessness. *Bell v. State*, 693 S.W.2d 434, 438 (Tex.Crim.App.1985); *see* TEX. PEN.CODE ANN. § 6.02(d)(e) (Vernon 2003); *see also Bynum v. State*, 874 S.W.2d 903, 907 (Tex. App.-Houston [1st Dist.] 1994, writ ref'd) (stating that "reckless conduct is a lesser included offense of aggravated assault"). Since both the "driving" and "recklessness" elements of reckless driving are included in the proof necessary to establish aggravated assault in this case, we find that the offense of reckless driving is included within the proof necessary to establish aggravated assault in this case.

■ In the second part of the *Feldman* and *Rousseau* analysis, we must determine whether there is at least a scintilla of evidence sufficient to entitle appellant to a lesser charge of reckless driving. *Feldman*, 71 S.W.3d at 750–51; *Rousseau*, 855 S.W.2d at 672; *Forest*, 989 S.W.2d at 367. Credibility determinations and conflicts in the evidence are not factors to consider in determining whether the trial court erred in failing to instruct the jury on a lesser-included offense. *Banda*, 890 S.W.2d at 60. We find that there was at least a scintilla of evidence to entitle appellant to the lesser charge of reckless driving.

Here, Officers Robert and Price both testified that appellant's driving was at least reckless. Further, Officer Price, who was part of the arrest team, testified that, after the gunshot struck appellant's vehicle, appellant leaned to the right and sped off. Although Officer Price was "fairly close to the vehicle," he did not testify that the gunshot caused the vehicle to swerve in any direction, suggesting that appellant drove straight towards the exit. Since there was at least a scintilla of evidence to suggest that appellant committed reckless driving, the trial court erred by denying the requested instruction.

## Harm Analysis

When an appellate court finds jury charge error, it must determine whether the error caused sufficient harm to require reversal. *Hutch v. State,* 922 S.W.2d 166, 170–71 (Tex.Crim.App.1996) (citing *Arline v. State,* 721 S.W.2d 348, 351 (Tex.Crim.App.1986)). The degree of harm necessary for reversal depends on whether the error was preserved. *Id.* at 171. Error properly preserved by an objection to the charge will require reversal "as long as the error is not harmless." *Id.* (quoting *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985)). This means any harm, regardless of degree, is sufficient to require reversal. *Id.* (citing *Arline,* 721 S.W.2d at 351). In conducting the harm analysis, a reviewing court may consider the following factors: (1) the charge itself, (2) the state of the evidence, including contested issues and the weight of the probative evidence, (3) arguments of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Id.*

Since appellant properly preserved the charge error in this case, we must determine whether there was any harm, regardless of degree. *See id.* Appellant contends that the error caused some harm because reckless driving carries a less severe penalty than aggravated assault, and because the jury was prevented from choosing which recklessness-based crime appellant was guilty of, deadly conduct or reckless driving. We disagree.

This Court, in *McCloud v. State,* held that the trial court's failure to submit an instruction on a lesser-included offense of reckless conduct was harmless error when the jury was instructed on attempted capital murder and lesser-included offenses of attempted murder and aggravated assault, and the jury found appellant guilty of attempted murder. 692 S.W.2d 580, 584 (Tex.App.-Houston [1st Dist.] 1985, no writ). On appeal, McCloud asserted the trial court erred in not instructing the jury on reckless conduct. *Id.* at 582. This Court held that the jury would have to find that McCloud had no specific intent to kill the officer before they could find him guilty of aggravated assault or reckless conduct. *Id.* at 584. However, since the jury found McCloud guilty of attempted murder, which requires a finding of specific intent, the jury would never have reached the lesser-included offense of reckless conduct, even with a proper charge. *Id.* Thus, the omission in the charge was harmless error. *Id.*

Here, the jury was instructed on the crime of aggravated assault and on the lesser-included offense of deadly conduct. Aggravated assault requires (1) that a person intentionally or knowingly (2) threaten another with imminent bodily injury (3) while exhibiting or using a deadly weapon during the commission of the assault. TEX. PEN.CODE ANN. §§ 22.01(a)(2), 22.02(a)(2) (Vernon Supp.2004–2005). Deadly conduct requires (1) that a person recklessly engage in conduct (2) that places another in imminent danger of serious bodily injury. *Id.* § 22.05(a) (Vernon 2003). The jury was thus confronted with whether appellant engaged in intentional or knowing conduct versus reckless conduct. Because the jury found appellant guilty of aggravated assault (intentional or knowing conduct), the jury never reached the lesser offense of deadly conduct (reckless conduct). Had there been an instruction on reckless driving, the jury would have to acquit appellant of aggravated assault first, by finding that appellant did not knowingly or intentionally threaten Officer Ferrell with imminent bodily injury. The jury charge clearly stated, "[u]nless you so find from the evidence beyond a reasonable doubt, or if you have a reason-

able doubt thereof, you will acquit the defendant of aggravated assault on a public servant and *next* consider whether the defendant is guilty of deadly conduct." (emphasis added). Since the jury found appellant guilty of intentional or knowing conduct, the jury would not have reached the questions of whether appellant was guilty of deadly conduct or reckless driving, even with the proper charge.

Appellants rely heavily on *Benge v. State. Benge* presents a case nearly identical to the one at hand. In that case, Benge was charged with aggravated assault with a motor vehicle, and the jury found Benge guilty of the lesser-included offense of deadly conduct. *Benge,* 94 S.W.3d at 33. Benge complained on appeal that the trial court's refusal to submit an instruction on reckless driving constituted reversible error. *Id.* After finding that reckless driving was a lesser-included offense of aggravated assault, the court held that there was some harm because the jury was not given the option to find Benge guilty of reckless driving, an offense with a less severe penalty than the one imposed for deadly conduct, but with a similar mental state—recklessness. *Id.* at 36–38. Thus, in *Benge,* the jury found the defendant guilty of deadly conduct, a reckless finding. *Id.* at 33. By not providing a charge on reckless driving, the jury was prevented from choosing between two recklessness crimes. *Id.* at 37–38. Because this choice was not provided, the jury was not able to choose a recklessness crime that carried a less severe penalty. *Id.* at 38. In the present case, however, the jury did not find appellant guilty of deadly conduct; instead, the jury found appellant guilty of aggravated assault, an intentional or knowing crime. By convicting of the higher mental state, the jury never reached the reckless finding. Thus, although the court erred in not submitting

the instruction on reckless driving, the error was harmless.

Accordingly, we overrule appellant's first point of error.

## JUROR MISCONDUCT

In his second point of error, appellant contends that the trial court erred in refusing to seat an alternate juror after the court discovered that an empaneled juror knew and spoke with one of the police officer witnesses. Appellant contends that this refusal to seat an alternate juror resulted in a violation of his rights under the Sixth Amendment of the United States Constitution and Article I, section 10 of the Texas Constitution.

During voir dire, the court recited the first initials and last names of forty Houston Police Department officers and asked if venire-members knew them. Although several potential jurors responded for other reasons, no one recognized any of the names. Neither the State's attorney nor appellant's trial counsel inquired further of any relationship between the venire-members and the prospective witnesses. Appellant's trial counsel, though, did inquire as to whether any potential jurors had close relationships with peace officers.

During a recess in the trial, Officer Price, a witness who had not yet testified, saw Juror Ghiselli, a woman he recognized, out in the hallway. The two had a brief conversation before Officer Price realized she was a juror in the same matter in which he was to testify. Officer Price immediately notified the prosecutor, who told the trial judge. The court questioned both Officer Price and Juror Ghiselli about their encounter and prior relationship. The trial judge questioned Officer Price as follows:

"THE COURT: All right. Mr. Davis (Defense Counsel), everyone is here. Defendant is present. Mr. Hart (Prose-

cutor) brought it to the Court's attention that you (Officer Price) had a brief encounter with a juror not solicited on your part, of course, but in the hall, could you just relate what happened so the record is clear?

"THE WITNESS (Officer Price): Yes, ma'am. I had been to the bathroom. I came out in the hallway, and two ladies were walking down the hallway and I recognized one of them. I don't know her name. I can't even really put where I know her from. I just know I knew her and just briefly spoke to her and she spoke to me. It's like, she had her badge, her badge was down here.

"THE COURT: For the record he's pointing to his belt, waist area.

"THE WITNESS: Down on her waist area. And I didn't see it, and when she said, "I'm a juror." I actually looked over to see and it. It was not here, and I saw it down there. I went, "O my God," what court? She said 183rd and I went, great, okay. And I told Mr. Hart.

"THE COURT: So at that point you just stopped talking to her?

"THE WITNESS: I didn't even say that. I just walked away.

"THE COURT: Okay. You just walked away. Okay. That's fine. And you can wait outside for us briefly.

"THE WITNESS: Okay. Thanks.

"THE COURT: And you don't know her name. What does she look like?

"THE WITNESS: She's middle aged and white and they all look alike.

\* \* \* \* \* \*

"THE COURT: Do you know what color—

"THE WITNESS: I can't even tell you that. After that, I didn't want to know anything."

The trial court then questioned Juror Ghiselli as follows:

"THE COURT: Let me just ask you a question. It appears [Officer Price] brought it to the attention of the Prosecutor that he did have a very brief conversation with you in the hall. At that point, I can see where you're wearing your badge, it is down at leg level. He did not realized (sic) that you were a juror in this case. He is going to be a witness later in the case. Now, believe me, I do not think that either one of y'all had any kind of improper conduct with each other out there in the hall. It's clear to the Court that it's an accidental encounter, a very casual conversation. Was there any discussion about the case or the alleged facts of this case or his duties as a police officer?

"JUROR: No. I did not know he was a policeman. I know him through a community called the Brazos Valley Emmaus Community.

"THE COURT: The what now?

"JUROR: Brazos Valley Emmaus Community. He doesn't even live in Houston. He lives in somewhere up north, College Station or Brenham. And its call (sic) A Walk to Emmaus, which is a Christian Retreat and that's the community I know him from.

\* \* \* \* \* \*

"JUROR: I never associated—when you said Virgil Price, it never clicked with me that it was him.

"THE COURT: Is there anything about that encounter that would in any way affect the way, or the fact that you know him or know him through your fellowship that would affect the way you would view the case, vote on the case, anything in that manner?

"JUROR: No. I think I would look at the evidence.

"THE COURT: Do you understand the same things that we talked about in voir dire, more than ever apply, of course they always apply, but my voir dire about starting everyone out evenly, you understand that would certainly be important in this case for you?

"JUROR: Yes.

"THE COURT: I think somewhere in the Charge it will say something to you like any personal knowledge that you may have about any witnesses or any events of the case you cannot use that as any evidence. Obviously, you don't know anything personally about any alleged events, but you may have some personal knowledge about the potential witness or the witness. You understand that instruction will be exactly for that type of situation you may find yourself in, and can you follow that law?

"JUROR: Yes, I can.

"THE COURT: You have any concerns about your ability now to be fair to either side?

"JUROR: No, I don't.

"THE COURT: Are you very confident about that?

"JUROR: Yes.

"THE COURT: Okay. Thank you very much.

"MR. DAVIS: Can I ask one question?

"THE COURT: No, you may not."

After the trial court denied appellant's attorney's request to question Juror Ghiselli, appellant explained to the trial court that he would have gotten more detail on how Juror Ghiselli knows Officer Price and, had he known of their acquaintance, he would have struck Juror Ghiselli for cause. Appellant further requested Juror Ghiselli be removed and an alternate juror seated in her place, but the court denied this motion. On the following day, before trial resumed, appellant re-urged his motion to replace Juror Ghiselli with an alternate, and the court again denied the request. Appellant contends that this refusal to seat an alternate juror resulted in a violation of his rights under the Sixth Amendment of the United States Constitution and Article I, section 10 of the Texas Constitution.

 "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. CONST. amend. VI; *see* TEX. CONST. art. 1, § 10 (stating that "[i]n all criminal prosecutions the accused shall have a speedy public trial by an impartial jury."). The voir dire process is designed to insure that an "intelligent, alert, disinterested, impartial, and truthful jury will perform the duty assigned to it." *Armstrong v. State*, 897 S.W.2d 361, 363 (Tex. Crim.App.1995). If a juror withholds material information during the voir dire process, the parties are denied the opportunity to intelligently exercise their peremptory challenges and challenges for cause, hampering the selection of an impartial jury. *Id.; Salazar v. State*, 562 S.W.2d 480, 482 (Tex.Crim.App.1978). A defendant must show that a juror withheld material information during voir dire, and the information is withheld despite due diligence exercised by the complaining party. *Franklin v. State*, 138 S.W.3d 351, 355–56 (Tex.Crim.App.2004) (*Franklin II* ). In the event a juror withholds material information during voir dire, it is not dispositive of the issue if the juror states it will not affect his verdict. *Id.* at 354–55. The good faith of the juror is "largely irrelevant when considering the materiality of information withheld." *Franklin v. State*, 12 S.W.3d 473, 478 (Tex.Crim.App.2000) (*Franklin I* ).

We first determine whether the trial court erred in this case. The Court of

Criminal Appeals recently addressed this error analysis in facts similar to these in *Franklin I* and *Franklin II*.[1] In these cases, Franklin was charged with the aggravated sexual assault of a child, C.N.T. *Id.* at 475. During voir dire, the State asked the panel members if any of them knew the victim, C.N.T. *Id.* No one on the panel indicated he knew C.N.T. *Id.* When the State called its first witness, C.N.T., Juror Spradlin informed the trial judge that she knew C.N.T. *Id.* at 476. Juror Spradlin indicated that she did not know the name, but that she did recognize C.N.T. when she saw her. *Id.* Juror Spradlin had a daughter in the same girl scout troop as C.N.T. and was the girl scout troop's assistant leader. *Id.* The trial court questioned Juror Spradlin on whether she could listen to the evidence in the case and base her judgment solely on what she heard from the stand, and she indicated that she could. *Id.* After the trial court denied Franklin's motion for mistrial, Franklin sought to question Juror Spradlin concerning her relationship with C.N.T. *Id.* The trial court denied this request. *Id.* Franklin then objected explaining what specific questions he would have asked to elicit any bias or prejudice from Juror Spradlin. *Id.* He stated

> [h]ad I been allowed to ask questions, I would have asked questions concerning the nature of the relationship with [C.N.T.], how long it had lasted, whether or not she could set aside any of her relationship with [C.N.T.] in sitting in judgment in this particular case, or whether she would tend to give more

credence or less credence to [C.N.T.]'s testimony and truthfulness due to that relationship.

*Id.*

On appeal in *Franklin I*, Franklin asserted that the trial court erred in denying his motion for mistrial when a juror had withheld material information. *Id.* at 477. In determining whether the information withheld by Juror Spradlin was material, the court stated that Franklin was "not permitted to determine the extent of the relationship between C.N.T. and Juror Spradlin *due to no fault of his own.*" *Id.* at 478 (emphasis original). The court went on to say that, because Franklin was not permitted to question Juror Spradlin regarding her relationship with C.N.T. to determine the extent of any prejudice that might have existed, the court could not conclude whether Juror Spradlin's relationship with the victim was immaterial. *Id.* at 478–79. Thus, the court indicated the error resulted from the trial court's failure to allow Franklin an opportunity to ask questions of Juror Spradlin. *Id.* at 479. However, in *Franklin II*, the court re-characterized the trial court's error as a failure to grant the only remedy available to Franklin, a mistrial, after Juror Spradlin revealed she withheld material information. *Franklin II*, 138 S.W.3d at 357 (stating that the "trial court's failure to grant a mistrial after Spradlin revealed that she withheld material information is constitutional error").[2] The *Franklin II* court went on to say that the trial court's failure to allow Franklin an opportunity to ques-

---

1. *Franklin I* and *II* both arise from the same set of facts. *Franklin I* addressed merely whether the trial court committed error, while *Franklin II* primarily addressed whether the court of appeals applied the proper standard of harm. *Franklin I*, 12 S.W.3d at 477, 479; *Franklin II*, 138 S.W.3d at 354.

2. Despite the court's re-characterizing of the error, Justice Keller noted that *"Franklin I* did not, and could not have, addressed whether the trial court made a mistake in denying the *mistrial* because the Court of Appeals never addressed whether the trial court erred in that regard." *Franklin II*, 138 S.W.3d at 359 (Keller, P.J., dissenting) (emphasis original).

tion Juror Spradlin compounded the situation since he could not then affirmatively get any evidence of bias on the record. *Id.* at 358.

The present case is distinguishable from *Franklin.* In *Franklin,* Franklin informed the court of the specific questions that he sought to ask the juror beyond those asked by the trial court. *Franklin I,* 12 S.W.3d at 476. This sufficiently apprised the judge of the specific additional information Franklin sought to gather, giving the trial court the opportunity to consider whether its questions were sufficient. *See id.* Here, appellant failed to notify the trial court of the specific questions appellant sought to ask beyond the thorough examination by the trial court. Appellant simply stated that he "would have gotten more detail on how she knows him." This global request did not sufficiently apprise the trial judge of what specific additional information appellant sought to elicit.

Secondly, appellant stated that had he known this information, he "would have struck her. It's kind of a no brainier [sic]. I struck [sic] anyone for cause." However, this assumes that Juror Ghiselli would have stated during voir dire that she knew Officer Price. The trial judge had asked during voir dire if anyone on the panel knew "V. R. Price," and no one responded. After the relationship was discovered, Juror Ghiselli indicated she did not recognize "V. R. Price" as the name of the individual she was familiar with from her retreat. The relationship between Juror Ghiselli and Officer Price appears to be a remote casual acquaintanceship that suggests, even if Officer Price's full name had been stated, Juror Ghiselli would not have responded to the inquiry. Thus, nothing short of walking Officer Price through the courtroom during voir dire would have alerted Juror Ghiselli that she knew a potential witness. Under the circum-

stances (1) that the only inquiry during voir dire regarding any relationship between prospective witness and venire-members was identification of the witnesses through initials and a last name, (2) that appellant's trial counsel inquired whether any venire-members had close relationships with peace officers, (3) that Officer Price did not know Juror Ghiselli's name, (4) that Juror Ghiselli did not know Officer Price's occupation, and (5) that their acquaintanceship was not discovered until mid-trial after voir dire, we cannot conclude that appellant was deprived of the right to exercise a peremptory strike or a challenge for cause.

■ Appellant's primary complaint, though, is the trial court's failure to seat an alternate juror. Article 33.011(b) of the Texas Code of Criminal Procedure governs the procedure for replacing jurors with alternates. TEX.CODE CRIM. PROC. ANN. art. 33.011(b) (Vernon 1989). It states that alternate jurors shall replace jurors who "are found to be unable or disqualified to perform their duties." *Id.* Bases for disqualification can be found in article 35.16. *See State v. Holloway,* 886 S.W.2d 482, 484–85 (Tex.App.-Houston [1st Dist.] 1994, writ ref'd) (suggesting that a disqualification under article 35.16 can arise even after the jury is impaneled). Here, none of the potential disqualifications arose. Specifically, there is no suggestion of any bias or prejudice on Juror Ghiselli's part; that was clearly established through the trial judge's questioning.

The lack of bias or prejudice is also evidenced by the remoteness of Juror Ghiselli and Officer Price's relationship. The relationship at issue in *Franklin I* was a much more close, personal connection than the one at issue here. *See Franklin I,* 12 S.W.3d at 476. In *Franklin I,* Juror Spradlin was the victim's assistant girl scout troop leader, and the relationship

was almost a parental role, which certainly had some tendency to show bias. *Id.; Franklin II,* 138 S.W.3d at 356. Here, Juror Ghiselli had a distant acquaintance with one witness.

Juror Ghiselli and Officer Price's relationship is more closely analogous to the one in *Decker v. State,* 717 S.W.2d 903 (Tex.Crim.App.1983). In *Decker,* after a juror had been selected and impaneled, the juror "recognized" the complainant, a fellow co-worker for several months. *Id.* at 904. After questioning by defense counsel, the court held that, because the two had never socialized or had any type of friendship, the information was not material. *Id.* at 907. The acquaintanceship through employment revealed no relationship that had any potential for prejudice or bias on the part of the juror. *Id.*

We encounter the same situation in the present case. Juror Ghiselli never knew Office Price was a police officer; they did not know each other's names; Officer Price did not know where he had met Juror Ghiselli. These facts demonstrate there was no existence of a friendship or any socializing between the two. We conclude the trial court did not err in refusing to dismiss the juror or in refusing to allow questioning of Juror Ghiselli.

We overrule appellant's second point of error.

### EXTRANEOUS OFFENSE

██ In his third point of error, appellant contends the trial court erred in admitting evidence of extraneous offenses when the State failed to give timely written notice even though appellant properly requested notice pursuant to Rule 404 of the Texas Rules of Evidence and article 37.07(3)(g) of the Texas Code of Criminal Procedure. *See* Tex.R. Evid. 404(b); *see* Tex.Code Crim. Proc. Ann. art. 37.07(3)(g) (Vernon Supp.2004–2005). We disagree.

Approximately fourteen months before trial, appellant properly requested pretrial notice of the State's intent to offer into evidence any prior crimes, wrongs or acts. The State failed to give any written notice of its intent to offer into evidence any extraneous offenses committed by appellant. Consequently, during pretrial matters, appellant sought the exclusion of any extraneous offenses committed by appellant, specifically, that appellant's bond was revoked and that he had failed to appear for a prior trial. The trial court overruled appellant's motion to exclude.

At trial, the State introduced State's exhibits 41 and 42, which documented appellant's revocation of bond and his failure to appear for a prior trial. The following exchange took place in admitting these exhibits:

"MR. HART (Prosecutor): At this time the State is going to offer into evidence State's Exhibit No. 41, and State's Exhibit No. 42, which are certified public documents taken out of the Court's file in this case. I'll tender to Mr. Davis.

"(State's Exhibits 41 and 42 offered.)

"MR. DAVIS (Defense Counsel): If you would just give me a second, Judge.

"THE COURT: Yes, sir.

"MR. DAVIS: Okay. Your Honor, *we agree to it.*

"THE COURT: All right. They will be admitted. What are the numbers again?

"(State's Exhibits 41 and 42 admitted)

"MR. HART: State's 41 and 42.

"THE COURT: They're admitted."

(emphasis added).

Although appellant properly moved to exclude the extraneous offense evidence pretrial, when the State sought to enter the evidence at trial, appellant agreed to

its admission. Thus, the State contends appellant failed to preserve this issue for review.

■ It is well settled that when a pretrial motion to suppress evidence is overruled, the defendant need not subsequently object at trial to the same evidence in order to preserve error on appeal. *Moraguez v. State*, 701 S.W.2d 902, 904 (Tex. Crim.App.1986); *Lemons v. State*, 135 S.W.3d 878, 882 (Tex.App.-Houston [1st Dist.] 2004, no pet.) However, when a defendant affirmatively asserts during trial that he has "no objection" to the admission of the complained of evidence, he waives any error in the admission of the evidence, despite the pretrial ruling. *Moraguez*, 701 S.W.2d at 904; *Lemons*, 135 S.W.3d at 882.

There is no question that appellant originally preserved error by obtaining an adverse ruling on his motion to suppress, and he was not required to object again at trial. However, when the State sought to admit the evidence at trial, appellant did more than to merely assert that he had no objection, instead appellant stated, "we agree to it." Appellant's agreement to the admission of the evidence waived any error in its admission, despite the pretrial ruling. *See Moraguez*, 701 S.W.2d at 904; *see Lemons*, 135 S.W.3d at 882. Thus, appellant waived any error. We overrule appellant's third point of error.

## CONCLUSION

We affirm the judgment of the trial court.