

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

**NO. 2-07-299-CR**
**NO. 2-07-300-CR**

MICHAEL S. NELSON                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

A jury found Appellant Michael S. Nelson guilty of robbery by threats and robbery causing bodily injury. In one point, Nelson argues that the trial court erred by not allowing him to question a juror, prior to jury deliberations, regarding the juror's possible familiarity with Nelson when the juror, after

------------

[1] *See* Tex. R. App. P. 47.4.

closing arguments, informed the trial court that he might have known Nelson. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On June 4, 2006, Nelson allegedly threatened the manager of a Family Dollar Company store in Fort Worth, Texas, with a knife and made repeated demands for the manager to "give me your money." After placing his hands in the air, the manager unlocked the register and stepped away. Nelson went around the counter, took money from the register, and left the store. The store's surveillance camera caught the incident on tape, and the tape of the event was played for the jury at trial.

As Nelson left the store, another employee who had witnessed the event followed him. The employee demanded that Nelson "come back." At this time, Nelson allegedly threatened the employee to "get back" or he would "cut" her. The employee continued to follow Nelson. The employee claims that Nelson then "hit [her] on the chest." The employee ceased her pursuit. At trial, both the manager and employee identified Nelson as the alleged perpetrator.

Nelson testified that he had threatened the manager with a straw and only asked for ten dollars because he was hungry. Nelson denied having a knife. He also denied ever hitting the employee. Nelson claimed that he had

2

threatened the manager in hopes that the manager would call 9-1-1, ostensibly so Nelson would be arrested and "get [his] medicine taken care of."

The record does not reflect how a juror, S.J., informed the court that he might know the defendant, but after closing arguments, prior to the jury's deliberations, and outside the presence of the jury, the trial court discussed with defense counsel that it had been brought to the court's attention that S.J. recognized Nelson. Defense counsel objected, claiming that had he known that S.J. was familiar with Nelson, "there [was] an increased likelihood I would have used a peremptory challenge to excuse him." The trial court overruled the objection.

Defense counsel then requested that he be allowed to question S.J. regarding the nature of the relationship S.J. had with Nelson. The trial court denied defense counsel's request, noting that the court had already instructed the jury to not "bring in any personal knowledge of people with facts into their deliberations or share those with any other person." The trial court also explained that it believed "that interfering with [S.J.] at this time might unduly emphasize [S.J.'s familiarity with Nelson]." Defense counsel then asked the trial court to re-instruct the jury concerning bringing personal knowledge into deliberations. The trial court re-instructed the jury prior to deliberation.

3

The jury found Nelson guilty of both charges. Nelson had elected to let the trial court assess punishment. Prior to assessing punishment, the trial court allowed defense counsel to question S.J. The following colloquy took place during defense counsel's direct examination of S.J. regarding S.J.'s knowledge of Nelson:

> [DEFENSE COUNSEL]: [S.J.], you are the juror who pointed out yesterday that you thought you might have known my client or had some sort of interaction with him; is that correct?
>
> A. Yes, I thought I knew who he was.
>
> Q. All right. On further reflection, have you decided whether or not that was, in fact, the case?
>
> A. I'm pretty sure that I've seen him a couple of times, yes.
>
> Q. Can you tell us what the context was?
>
> A. My family used to own a business [near where the alleged robbery occurred], and I would work there frequently. And I think that he would come in a couple of times asking for work or money or whatever.
>
> Q. So he had actually come to your place of business asking for money?
>
> A. Yeah. Usually asking for work.
>
> Q. Okay. But also for money?
>
> A. I'm not positive of that, no.
>
> Q. Okay. Is there any particular reason why that information was not shared with us during the jury selection process?

4

A. Yes. It's been several years, I didn't recognize him, really, until he started talking. As soon as he started talking, I recognized him because he has a very distinct manner of speaking and I recognized him as being the person that came in. I never actually talked to him and stuff, but I had seen him come in and I had heard him talking before.

. . . .

Q. You still would have said that you didn't know who he was? Because I asked specifically during jury selection does anybody know me or [Nelson]. You wouldn't have answered that question differently?

A. I'm sorry, I misunderstood what you asked me the first time.

Q. Yesterday during jury selection one of the first question I asked, maybe the first one was, does anybody here know me or [Nelson], after I introduced the two of us.

A. At that time, I did not know who he was at all.

Q. So if you had -- if the recollection came to you later, would you have answered that question differently?

A. Yes.

Q. And would you have given us the same information?

A. Yes. I would have given you the information I just now gave you that you're asking me.

Q. And so when I asked the question about whether that knowledge would have influenced your verdict at that point in the proceedings, would you have given a different answer?

[PROSECUTOR]: I'm going to –

[S.J.]: I would have said no.

5

[DEFENSE COUNSEL]: Okay.

[PROSECUTOR]: Well --

[DEFENSE COUNSEL]: So at that point in the trial, without having heard any evidence, you would have answered that you didn't think that that relationship would have any influence on your verdict, that's what you would have said at that time?

A. Right. Not because -- I mean -- I wouldn't have let it affect me whether I'm going to name the man innocent or guilty, no, it's too important a decision.

[DEFENSE COUNSEL]: All right. Thank you. That's all the questions. Pass the witness.

The State had no questions for S.J., so the court thanked and excused him. Defense counsel and the trial court then participated in the following colloquy:

[DEFENSE COUNSEL]: I do have a -- I need to reurge, probably since you've now given me the opportunity to question the juror, I think the juror was truthful with us and he was being honest in his answers that he gave. However, since I have peremptory challenges to exercise, I believe that I would have challenged him based on the fact that he had been in the store asking for money. I would have challenged him on that basis. And I didn't have the opportunity to do that. And so, at this point, I would ask for a mistrial.

[COURT]: Denied.

The trial then proceeded to the punishment phase. The trial court sentenced Nelson to thirty-five years' incarceration for each of the two counts of robbery with the sentences to run concurrently. This appeal followed.

6

### III. DISCUSSION

In his sole point, Nelson complains that the trial court erred by not allowing him to question S.J. regarding his potential relationship with Nelson before the jury deliberated.

### 1. The Right to an Impartial Jury

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI; *see also* Tex. Const. art. 1 § 10 ("[i]n all criminal prosecutions the accused shall have a speedy public trial by an impartial jury"); *Franklin v. State*, 138 S.W.3d 351, 354 (*Franklin II*) (Tex. Crim. App. 2004). Included in the constitutional right to an impartial jury is the ability to conduct adequate voir dire to identify unqualified jurors. *Franklin II*, 138 S.W.3d at 354. The Texas Court of Criminal Appeals has "consistently held that essential to the Sixth Amendment guarantees of the assistance of counsel and trial before an impartial jury 'is the right to question veniremembers in order to intelligently exercise peremptory challenges and challenges for cause.'" *Id.* (quoting *Raby v. State*, 970 S.W.2d 1, 10 (Tex. Crim. App. 1998)).

When a juror "'withholds material information during the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury.'" *Franklin II*, 138

7

S.W.3d at 354 (quoting *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978)). Thus, the defendant "must show that the juror withheld material information during voir dire, and the information is withheld despite due diligence exercised by the defendant." *Franklin II*, 138 S.W.3d at 355–56. In order to show materiality, the concealed information does not have to show actual bias, just that it has a tendency to show bias. *Id*. at 356. "[M]ere familiarity with a witness is not necessarily material information." *Franklin v. State*, 12 S.W.3d 473, 478 (*Franklin I*) (Tex. Crim. App. 2000); *see Decker v. State*, 717 S.W.2d 903, 907 (Tex. Crim. App. 1983). In the event that a juror withholds material information during voir dire, it is not dispositive of the issue if the juror states that it will not affect his verdict. *Franklin II*, 138 S.W.3d at 355–56. The good faith of the juror is "largely irrelevant when considering the materiality of information withheld." *Franklin I*, 12 S.W.3d at 478.

The burden is initially on the parties to be diligent during voir dire and ask all pertinent questions to reveal potential bias. *Gonzales v. State*, 3 S.W.3d 915, 917–18 (Tex. Crim. App. 1999). Defense counsel is entitled to rely on the questions asked by the trial court and prosecutor. *Armstrong v. State*, 897 S.W.2d 361, 364 n.1 (Tex. Crim. App. 1995). In *Franklin II*, the Texas Court of Criminal Appeals held that a juror's withholding of material information,

despite the defendant's due diligence, was constitutional error. 138 S.W.3d at 357; *see* Tex. R. App. P. 44.2(a).

We will assume without deciding that Nelson has shown jury-selection error and that he was deprived of the opportunity to exercise a peremptory strike or challenge S.J. for cause. Thus, we turn to a harm analysis.[2]

### 2. Harmless Error Review

If constitutional error is shown, we must reverse the judgment of conviction unless we determine beyond a reasonable doubt that the error in jury selection did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a); *Franklin II*, 138 S.W.3d at 354. In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

Our harmless error analysis does not focus on the propriety of the outcome of the trial; instead, we calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v.*

---

[2] Nelson complains that a proper harm analysis cannot be performed because he was unable to "establish an evidentiary basis for harm based on the trial court's actions." We disagree. The trial court did not deny Nelson the opportunity to develop the record; rather, the trial court allowed Nelson to fully question S.J. after the jury deliberated. *See Franklin II*, 138 S.W.3d at 355; *Franklin I*, 12 S.W.3d at 478.

9

*State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001).  We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity.  *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).  This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not "in the light most favorable to the prosecution."  *Id.* at 586.

Here, Nelson was able to question S.J. in an effort to show actual bias or prejudice, and the results of that questioning showed no actual bias or prejudice.  *See Decker*, 717 S.W.2d at 907 (holding that acquaintance through employment was not relationship with potential for bias or prejudice); *Brown v. State*, 183 S.W.3d 728, 737–40 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding that juror's distant acquaintance with witness did not suggest bias or prejudice).

Nothing in the record that Nelson was allowed to develop by questioning S.J. demonstrates a reasonable possibility that the perceived error contributed to Nelson's conviction.  *See Mosley*, 983 S.W.2d at 259.  S.J. did not know Nelson by name.  S.J. noted that it wasn't until he heard Nelson speak that he even knew he was familiar with him.  S.J. testified that it had "been several

10

years" since he had seen Nelson and that he had "never actually talked to [Nelson]." When asked whether his previous knowledge of Nelson would have influenced his verdict, S.J. said, "no." S.J. even testified that he would not have let his knowledge of Nelson affect "whether I'm going to name the man innocent or guilty . . . it's too important a decision." Nothing in the record demonstrates that S.J.'s distant memory of Nelson affected the jury at all.

There is also nothing in the record to indicate that the State used S.J.'s awareness of Nelson to influence the jury. But the State did offer a great amount of evidence regarding Nelson's guilt of the charges. Two eyewitnesses of the events leading to Nelson's arrest testified at trial. Both witnesses testified that Nelson had robbed the manager. The alleged bodily-injury victim testified to Nelson's having struck her. A videotape of the robbery was played for the jury, and Nelson himself admitted he was trying to get arrested. We conclude that S.J.'s limited knowledge of Nelson had little to no impact on the jury's verdict in light of this evidence.

Evaluating the record in a neutral and impartial manner, we hold that S.J.'s remote memories of Nelson had no effect on the outcome of Nelson's trial and that there is no reasonable possibility that S.J.'s faint familiarity with Nelson contributed to Nelson's conviction. After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond

11

a reasonable doubt that the alleged error did not contribute to Nelson's conviction or punishment. Tex. R. App. P. 44.2(a). We overrule Nelson's sole point.

## IV. CONCLUSION

Having overruled Nelson's sole point, we affirm the trial court's judgments.

PER CURIAM

PANEL: MEIER, J.; CAYCE, C.J.; and MCCOY, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 2, 2009