COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-07-299-CR

                                        NO. 2-07-300-CR

 

 

MICHAEL S. NELSON                                                           APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 3 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                          I.  INTRODUCTION








A jury found Appellant Michael S. Nelson guilty
of robbery by threats and robbery causing bodily injury.  In one point, Nelson argues that the trial
court erred by not allowing him to question a juror, prior to jury deliberations,
regarding the juror=s possible familiarity with
Nelson when the juror, after closing arguments, informed the trial court that
he might have known Nelson.  We will
affirm.

                          II.  FACTUAL AND PROCEDURAL BACKGROUND

On June 4, 2006, Nelson allegedly threatened the
manager of a Family Dollar Company store in Fort Worth, Texas, with a knife and
made repeated demands for the manager to Agive me
your money.@ 
After placing his hands in the air, the manager unlocked the register
and stepped away.  Nelson went around the
counter, took money from the register, and left the store.  The store=s
surveillance camera caught the incident on tape, and the tape of the event was
played for the jury at trial.

As Nelson left the store, another employee who
had witnessed the event followed him. 
The employee demanded that Nelson Acome
back.@  At this time, Nelson allegedly threatened the
employee to Aget back@ or he
would Acut@
her.  The employee continued to follow
Nelson.  The employee claims that Nelson
then Ahit
[her] on the chest.@ 
The employee ceased her pursuit. 
At trial, both the manager and employee identified Nelson as the alleged
perpetrator.








Nelson testified that he had threatened the
manager with a straw and only asked for ten dollars because he was hungry.  Nelson denied having a knife.  He also denied ever hitting the
employee.  Nelson claimed that he had
threatened the manager in hopes that the manager would call 9-1-1, ostensibly
so Nelson would be arrested and Aget
[his] medicine taken care of.@

The record does not reflect how a juror, S.J.,
informed the court that he might know the defendant, but after closing
arguments, prior to the jury=s
deliberations, and outside the presence of the jury, the trial court discussed
with defense counsel that it had been brought to the court=s
attention that S.J. recognized Nelson. 
Defense counsel objected, claiming that had he known that S.J. was
familiar with Nelson, Athere [was] an increased
likelihood I would have used a peremptory challenge to excuse him.@  The trial court overruled the objection.

Defense counsel then requested that he be allowed
to question S.J. regarding the nature of the relationship S.J. had with
Nelson.  The trial court denied defense
counsel=s
request, noting that the court had already instructed the jury to not Abring in
any personal knowledge of people with facts into their deliberations or share
those with any other person.@  The trial court also explained that it
believed Athat interfering with [S.J.] at
this time might unduly emphasize [S.J.=s
familiarity with Nelson].@ 
Defense counsel then asked the trial court to re-instruct the jury
concerning bringing personal knowledge into deliberations.  The trial court re-instructed the jury prior
to deliberation.








The jury found Nelson guilty of both
charges.  Nelson had elected to let the
trial court assess punishment.  Prior to
assessing punishment, the trial court allowed defense counsel to question
S.J.  The following colloquy took place
during defense counsel=s direct examination of S.J.
regarding S.J.=s knowledge of Nelson: 

[DEFENSE
COUNSEL]:  [S.J.], you are the juror who pointed out yesterday that
you thought you might have known my client or had some sort of interaction with
him; is that correct?

 

A.     Yes, I thought I knew who he was.

 

Q.     All right.  On further
reflection, have you decided whether or not that was, in fact, the case?

 

A.     I=m pretty sure that I=ve seen him a couple of
times, yes.

 

Q.     Can you tell us what the context was?

 

A.     My family used to own a business [near where the alleged robbery
occurred], and I would work there frequently. 
And I think that he would come in a couple of times asking for work or
money or whatever.

 

Q.     So he had actually come to your place of business asking for
money?

 

A.     Yeah.  Usually asking for
work.

 

Q.     Okay.  But also for money?

 

A.     I=m not positive of that,
no.

 

Q.     Okay.  Is there any
particular reason why that information was not shared with us during the jury
selection process?








A.     Yes.  It=s been several years, I
didn=t recognize him, really,
until he started talking.  As soon as he
started talking, I recognized him because he has a very distinct manner of
speaking and I recognized him as being the person that came in.  I never actually talked to him and stuff, but
I had seen him come in and I had heard him talking before.

 

. . . . 

 

Q.     You still would have said that you didn=t know who he was?  Because I asked specifically during jury
selection does anybody know me or [Nelson]. 
You wouldn=t have answered that
question differently?

 

A.     I=m sorry, I misunderstood
what you asked me the first time.

 

Q.     Yesterday during jury selection one of the first question I
asked, maybe the first one was, does anybody here know me or [Nelson], after I
introduced the two of us.

 

A.     At that time, I did not know who he was at all.

 

Q.     So if you had ‑‑ if the recollection came to you
later, would you have answered that question differently?

 

A.     Yes.

 

Q.     And would you have given us the same information?

 

A.     Yes.  I would have given
you the information I just now gave you that you=re asking me.

 

Q.     And so when I asked the question about whether that knowledge
would have influenced your verdict at that point in the proceedings, would you
have given a different answer?

 

[PROSECUTOR]:  I=m going to B

 

[S.J.]:  I
would have said no.  








[DEFENSE
COUNSEL]:  Okay.  

 

[PROSECUTOR]:  Well ‑‑

 

[DEFENSE
COUNSEL]:  So at that point in the trial, without having heard any
evidence, you would have answered that you didn=t think that that
relationship would have any influence on your verdict, that=s what you would have
said at  that time?

 

A.     Right.  Not because ‑‑
I mean ‑‑ I wouldn=t have let it affect me whether I=m going to name the man
innocent or guilty, no, it=s too important a decision.

 

[DEFENSE COUNSEL]:  All right.  Thank you. 
That=s all the questions.  Pass the witness.  

The State had no questions for S.J., so the court
thanked and excused him.  Defense counsel
and the trial court then participated in the following colloquy:

[DEFENSE
COUNSEL]:  I do have a ‑‑ I need to reurge, probably
since you=ve now given me the
opportunity to question the juror, I think the juror was truthful with us and
he was being honest in his answers that he gave.  However, since I have peremptory challenges
to exercise, I believe that I would have challenged him based on the fact that
he had been in the store asking for money. 
I would have challenged him on that basis.  And I didn=t have the 
opportunity to do that.  And so,
at this point, I would ask for a mistrial.

 

[COURT]: 
Denied.  

The trial then proceeded to the punishment
phase.  The trial court sentenced Nelson
to thirty-five years= incarceration for each of the
two counts of robbery with the sentences to run concurrently.  This appeal followed.








                                           III.  DISCUSSION

In his sole point, Nelson complains that the
trial court erred by not allowing him to question S.J. regarding his potential
relationship with Nelson before the jury deliberated.

1.     The
Right to an Impartial Jury

AIn all criminal prosecutions,
the accused shall enjoy the right to a speedy and public trial, by an impartial
jury.@  U.S. Const. amend. VI; see also Tex.
Const. art. 1 ' 10 (A[i]n all
criminal prosecutions the accused shall have a speedy public trial by an
impartial jury@); Franklin v. State, 138
S.W.3d 351, 354 (Franklin II) (Tex. Crim. App. 2004).  Included in the constitutional right to an
impartial jury is the ability to conduct adequate voir dire to identify
unqualified jurors.  Franklin II,
138 S.W.3d at 354.  The Texas Court of
Criminal Appeals has Aconsistently held that essential
to the Sixth Amendment guarantees of the assistance of counsel and trial before
an impartial jury >is the right to question
veniremembers in order to intelligently exercise peremptory challenges and
challenges for cause.=@  Id. (quoting Raby v. State, 970
S.W.2d 1, 10 (Tex. Crim. App. 1998)).








When a juror A>withholds
material information during the voir dire process, the parties are denied the
opportunity to exercise their challenges, thus hampering their selection of a
disinterested and impartial jury.=@  Franklin II, 138 S.W.3d at 354 (quoting
Salazar v. State, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978)).  Thus, the defendant Amust
show that the juror withheld material information during voir dire, and the
information is withheld despite due diligence exercised by the defendant.@  Franklin II, 138 S.W.3d at 355B56.  In order to show materiality, the concealed
information does not have to show actual bias, just that it has a tendency to
show bias.  Id. at 356.  A[M]ere
familiarity with a witness is not necessarily material information.@  Franklin v. State, 12 S.W.3d 473, 478
(Franklin I) (Tex. Crim. App. 2000); see Decker v. State, 717
S.W.2d 903, 907 (Tex. Crim. App. 1983). 
In the event that a juror withholds material information during voir
dire, it is not dispositive of the issue if the juror states that it will not
affect his verdict.  Franklin II,
138 S.W.3d at 355B56.  The good faith of the juror is Alargely
irrelevant when considering the materiality of information withheld.@  Franklin I, 12 S.W.3d at 478.








The burden is initially on the parties to be
diligent during voir dire and ask all pertinent questions to reveal potential
bias.  Gonzales v. State, 3 S.W.3d
915, 917B18 (Tex.
Crim. App. 1999).  Defense counsel is
entitled to rely on the questions asked by the trial court and
prosecutor.  Armstrong v. State, 897 S.W.2d 361, 364 n.1 (Tex.
Crim. App. 1995).  In Franklin II,
the Texas Court of Criminal Appeals held that a juror=s
withholding of material information, despite the defendant=s due
diligence, was constitutional error.  138
S.W.3d at 357; see Tex. R. App. P. 44.2(a).

We will assume without deciding that Nelson has
shown jury-selection error and that he was deprived of the opportunity to
exercise a peremptory strike or challenge S.J. for cause.  Thus, we turn to a harm analysis.[2]

2.     Harmless
Error Review

If constitutional error is shown, we must reverse
the judgment of conviction unless we determine beyond a reasonable doubt that
the error in jury selection did not contribute to the conviction or
punishment.  Tex. R. App. P. 44.2(a); Franklin
II, 138 S.W.3d at 354.  In applying
the Aharmless
error@ test,
our primary question is whether there is a Areasonable
possibility@ that the error might have
contributed to the conviction.  Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).








Our harmless error analysis does not focus on the
propriety of the outcome of the trial; instead, we calculate as much as
possible the probable impact on the jury in light of the existence of other
evidence.  Wesbrook v. State, 29
S.W.3d 103, 119 (Tex. Crim. App. 2000), cert. denied, 532 U.S. 944
(2001).  We consider the source and
nature of the error, the extent that it was emphasized by the State, its
probable collateral implications, the weight a juror would probably place on
the error, and whether declaring it harmless would be likely to encourage the
State to repeat it with impunity.  Harris
v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).  This requires us to evaluate the entire
record in a neutral, impartial, and even-handed manner, not Ain the
light most favorable to the prosecution.@  Id. at 586.

Here, Nelson was able to question S.J. in an
effort to show actual bias or prejudice, and the results of that questioning
showed no actual bias or prejudice.  See
Decker, 717 S.W.2d at 907 (holding that acquaintance through employment was
not relationship with potential for bias or prejudice); Brown v. State,
183 S.W.3d 728, 737B40 (Tex. App.CHouston
[1st Dist.] 2005, no pet.) (holding that juror=s
distant acquaintance with witness did not suggest bias or prejudice).








Nothing in the record that Nelson was allowed to
develop by questioning S.J. demonstrates a reasonable possibility that the
perceived error contributed to Nelson=s
conviction.  See Mosley, 983
S.W.2d at 259.  S.J. did not know Nelson
by name.  S.J. noted that it wasn=t until
he heard Nelson speak that he even knew he was familiar with him.  S.J. testified that it had Abeen
several years@ since he had seen Nelson and
that he had Anever actually talked to
[Nelson].@ 
When asked whether his previous knowledge of Nelson would have
influenced his verdict, S.J. said, Ano.@  S.J. even testified that he would not have
let his knowledge of Nelson affect Awhether
I=m going
to name the man innocent or guilty . . . it=s too
important a decision.@ 
Nothing in the record demonstrates that S.J.=s
distant memory of Nelson affected the jury at all.

There is also nothing in the record to indicate
that the State used S.J.=s awareness of Nelson to
influence the jury.  But the State did
offer a great amount of evidence regarding Nelson=s guilt
of the charges.  Two eyewitnesses of the
events leading to Nelson=s arrest testified at
trial.  Both witnesses testified that
Nelson had robbed the manager.  The
alleged bodily-injury victim testified to Nelson=s having
struck her.  A videotape of the robbery
was played for the jury, and Nelson himself admitted he was trying to get
arrested.  We conclude that S.J.=s
limited knowledge of Nelson had little to no impact on the jury=s
verdict in light of this evidence.








Evaluating the record in a neutral and impartial
manner, we hold that S.J.=s remote memories of Nelson had
no effect on the outcome of Nelson=s trial
and that there is no reasonable possibility that S.J.=s faint
familiarity with Nelson contributed to Nelson=s
conviction.  After carefully reviewing
the record and performing the required harm analysis under rule 44.2(a), we
hold beyond a reasonable doubt that the alleged error did not contribute to
Nelson=s
conviction or punishment.  Tex. R. App.
P. 44.2(a).  We overrule Nelson=s sole
point.

                                          IV.  CONCLUSION

Having overruled Nelson=s sole
point, we affirm the trial court=s
judgments.

PER CURIAM

PANEL:  MEIER, J.; CAYCE, C.J.;
and MCCOY, J.

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  April 2, 2009











[1]See Tex. R. App. P. 47.4.





[2]Nelson complains that a
proper harm analysis cannot be performed because he was unable to Aestablish an evidentiary
basis for harm based on the trial court=s actions.@  We
disagree.  The trial court did not deny
Nelson the opportunity to develop the record; rather, the trial court allowed
Nelson to fully question S.J. after the jury deliberated.  See Franklin II, 138 S.W.3d at
355; Franklin I, 12 S.W.3d at 478.