

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-08-388-CR

SAMUEL CENDEJAS FERNANDEZ                                           APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

------------

FROM COUNTY CRIMINAL COURT NO. 6 OF TARRANT COUNTY

------------

## OPINION

------------

In two related issues, appellant Samuel Cendejas Fernandez appeals his conviction for driving while intoxicated (DWI),[1] contending that the police did not have reasonable suspicion to stop his pickup. We affirm.

------------

[1] *See* Tex. Penal Code Ann. § 49.04(a) (Vernon 2003).

## Background Facts

A few minutes after two o'clock on the morning of September 14, 2007, on Camp Bowie Boulevard, Fort Worth Police Officer Kenneth Simmons heard Fernandez's black pickup loudly squeal its tires and saw light smoke coming from the tires as the pickup fishtailed about two feet outside of its lane of traffic. Because he concluded that Fernandez was traveling without control and unsafely, Officer Simmons immediately went to his own car, drove behind Fernandez's pickup, and initiated a traffic stop. The traffic stop led to the State's charging Fernandez with DWI.

Fernandez filed several pretrial motions, including a motion to suppress all evidence obtained following the police's stop of his pickup because the police allegedly made the stop without a search warrant or any reasonable suspicion of criminal activity. The trial court denied Fernandez's motion to suppress, and then Fernandez entered an open plea of nolo contendere, received a sentence of thirty days' confinement and a $750 fine, and filed his notice of appeal. The State asked the trial court to enter findings of fact and conclusions of law related to the suppression issue, and the trial court did so by adopting the State's suggested findings and conclusions.

The Legality of Fernandez's Detention

In his first issue, Fernandez argues that the trial court erred by denying his motion to suppress and finding that Officer Simmons had reasonable suspicion to pull him over and detain him for, among other offenses, reckless driving.

Standard of review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn

3

on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id*. at 819. We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

4

Applicable law and analysis

"An officer must have probable cause to stop a vehicle and arrest the driver for a traffic violation without a warrant." *State v. Ballman*, 157 S.W.3d 65, 70 (Tex. App.—Fort Worth 2004, pet. ref'd); *see State v. Ballard*, 987 S.W.2d 889, 892 (Tex. Crim. App. 1999). Alternatively, an officer may stop and detain a driver, rather than arrest the driver, on reasonable suspicion of criminal activity. *Tex. Dep't of Public Safety v. Gilfeather*, 293 S.W.3d 875, 879–80 (Tex. App.—Fort Worth 2009, no pet.) (en banc op. on reh'g) (holding that an officer's stop of a car was justified because the officer reasonably suspected the offense of speeding); *Fowler v. State*, 266 S.W.3d 498, 502 (Tex. App.—Fort Worth 2008, pet. ref'd) (en banc); *see Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S. Ct. 1868, 1879–80 (1968); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005); *Carmouche v. State*, 10 S.W.3d 323, 328–29 (Tex. Crim. App. 2000); *Bracken v. State*, 282 S.W.3d 94, 97–99 (Tex. App.—Fort Worth 2009, pet. ref'd). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492.

Reasonable suspicion is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.* In other words, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Garcia v. State*, 827 S.W.2d 937, 942 n.5 (Tex. Crim. App. 1992) (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 1723 (1978)); *see also State v. Patterson*, 291 S.W.3d 121, 123 (Tex. App.—Amarillo 2009, no pet.) (explaining that the "subjective reasons uttered by the officer to legitimize the stop have no bearing on the outcome if the totality of the circumstances nonetheless would lead a police officer to reasonably suspect that crime is afoot").

"It is well settled that a traffic violation committed in an officer's presence authorizes an initial stop." *Armitage v. State*, 637 S.W.2d 936, 939 (Tex. Crim. App. [Panel Op.] 1982); *see Walter v. State*, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000). The State "is not required to show a traffic offense was actually committed, but only that the officer reasonably believed a violation was in progress." *Tex. Dep't of Pub. Safety v. Fisher*, 56 S.W.3d 159, 163

6

(Tex. App.—Dallas 2001, no pet.); *see Tex. Dep't of Pub. Safety v. Axt*, 292 S.W.3d 736, 739 (Tex. App.—Fort Worth 2009, no pet.).

One of the trial court's conclusions of law states that Officer Simmons had reasonable suspicion that Fernandez had committed the traffic offense of reckless driving. A person commits that offense when the person drives a vehicle in willful or wanton disregard for the safety of persons or property. Tex. Transp. Code Ann. § 545.401(a) (Vernon 1999). "In the context of reckless driving, 'willful and wanton disregard' means the 'deliberate and conscious indifference to the safety of others.'" *Brown v. State*, 183 S.W.3d 728, 733 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). Obviously, "[p]roof of an evil or malicious intent is not an element of reckless driving." *White v. State*, 647 S.W.2d 751, 753 (Tex. App.—Fort Worth 1983, pet. ref'd). The trial court adopted the following findings of fact that support its reckless driving conclusion:

- "Officer Simmons saw [Fernandez's] vehicle rapidly accelerate in speed, causing the vehicle to fishtail and the tires to cross over the divider lane approximately two feet";

- "Officer Simmons heard [Fernandez's] vehicle make a loud screech and observed smoke coming from the tires as a result of the tires squealing";

- "At the time of the offense, there was other traffic traveling on Camp Bowie . . .[,] and [Fernandez] could have possibly

7

wrecked into somebody when his car crossed over into other lanes of traffic"; and

- "Officer Simmons described the driving behavior as unsafe and typical of someone who is not in control of their vehicle."

The record, when viewed in the light most favorable to the court's ruling, supports these findings. *See Wiede*, 214 S.W.3d at 24; *Kelly*, 204 S.W.3d at 818–19. Fernandez argues (and the dissenting opinion asserts), however, that the testimony does not identify vehicles alongside, nor in proximity to him when he fishtailed and that the facts therefore still do not amount to reasonable suspicion of reckless driving. But Officer Simmons testified that there was other traffic on the same street as Fernandez when he went into more than one lane of traffic, that Fernandez put other drivers in "danger" because he "could have possibly wrecked," and, most importantly, that there were "maybe three" cars immediately in the vicinity of Fernandez's pickup.[2] Fort Worth Police

---

[2] Any relevance of the dissenting opinion's inclusion of beyond-the-record details concerning the length of Camp Bowie Boulevard is negated by Officer Simmons's testimony that three vehicles were in Fernandez's immediate vicinity when he peeled out. *See* Dissenting Op. at 12–13. Officer Simmons's testimony in that regard also belies the dissenting opinion's statements that there is "no evidence of another vehicle . . . near Appellant's vehicle during the three seconds of acceleration." *Id.* at 20. The dissenting opinion's attempt to guess that Fernandez's car might have been traveling the opposite direction and across a broad grassy median on Camp Bowie Boulevard from the other cars on the boulevard reconstructs the phrase "immediate vicinity" and is unsupported by the record. And contrary to the dissenting opinion's statement, we are not

8

Officer Steven Pelton, who was patrolling Camp Bowie Boulevard on the morning of Fernandez's arrest, also saw Fernandez's pickup peeling out and heard its tires squealing, and he also believed that Fernandez was operating the pickup unsafely.

While part of the record indicates that there were no cars in the specific lane of traffic that Fernandez fishtailed into at the precise time that he did so,[3] we agree with the State that the language of the reckless driving statute does not require actions that caused a wreck or nearly caused a wreck. *See, e.g., Jiron v. State*, No. 05-08-00056-CR, 2009 WL 866213, at *3 (Tex. App.—Dallas Apr. 2, 2009, no pet.) (not designated for publication) (holding that an officer had reasonable suspicion for a traffic stop when the defendant's car spun its tires while accelerating through an intersection, moved side to side

---

speculating at all about the positioning of cars in relation to Fernandez's car; we are simply viewing the "immediate vicinity" testimony in the light most favorable to the trial court's ruling, as we are constrained by binding precedent to do. *See id.* at 12; *Wiede*, 214 S.W.3d at 24.

[3] ... The State's prosecutor asked Officer Simmons:

Q.     Okay.  So he did go into other lanes of traffic?

A.     Yes, ma'am.

Q.     And if there had been cars there, he could have possibly hit them?

A.     Yes ma'am.

9

through the intersection, and "could have damaged other vehicles or property or injured a person in the area"); *Moore v. State*, No. 14-02-00388-CR, 2003 WL 1087997, at *1–2 (Tex. App.—Houston [14th Dist.] Mar. 13, 2003, no pet.) (mem. op., not designated for publication) (upholding the denial of a motion to suppress and concluding that law enforcement had reasonable suspicion of reckless driving when a car drove at a high rate of speed into a parking lot where people were standing, causing bystanders to step up onto the sidewalk, and then quickly left the parking lot while squealing its tires). Thus, Officer Simmons could have reasonably suspected that Fernandez drove his pickup with willful or wanton disregard for others' safety. *See* Tex. Transp. Code Ann. § 545.401(a).

The dissenting opinion's expression that an officer cannot stop a car based on reasonable suspicion of a moving traffic violation[4] contravenes recent binding precedent. *See Gilfeather*, 293 S.W.3d at 879; *Bracken*, 282 S.W.3d at 97–99; *see also Strauss v. State*, 121 S.W.3d 486, 490 (Tex. App.—Amarillo 2003, pet. ref'd) ("It is clear that an officer who witnesses a traffic violation has sufficient authority to stop the vehicle."); *McQuarters v. State*, 58 S.W.3d 250, 255 (Tex. App.—Fort Worth 2001, pet. ref'd).

---

[4] *See* Dissenting Op. at 13–19.

10

Also, the dissenting opinion's implication that Officer Simmons needed an investigatory reason to stop Fernandez is incorrect; an officer is justified to stop a driver and arrest him or issue a ticket to him when the officer actually sees a traffic violation because that may be sufficient probable cause. *See* Tex. Transp. Code Ann. § 543.001 (Vernon 1999); Tex. Code Crim. Proc. Ann. art. 14.01(b) (Vernon 2005); *Azeez v. State*, 248 S.W.3d 182, 189–90 (Tex. Crim. App. 2008); *State v. Gray*, 158 S.W.3d 465, 469 (Tex. Crim. App. 2005). And even if a purely investigative reason for Officer Simmons's stop had been required and Officer Simmons could not have stopped Fernandez simply with the goal of issuing a citation or making an arrest, the dissent's broad statement that reckless driving is "not a circumstance that can be clarified by . . . further investigation"[5] is not true; an officer may have questions stemming from what he just witnessed, such as whether something was wrong with the driver, the driver's car, or the car's tires that caused the apparent reckless driving. Such questions could assist the officer in investigating reckless driving —and not merely describe "a community caretaking function"[6]—since as even the dissenting opinion recognizes, reckless driving requires "*deliberate*" or "*conscious*" indifference to others' safety. *See* Dissenting Op. at 22; *Brown*,

---

[5] ... Dissenting Op. at 18.

[6] ... *See* Dissenting Op. at 19.

11

183 S.W.3d at 733. Thus, there could be as many reasons to investigate reckless driving, and to ensure that an officer had seen an actual offense, as there are for any other crime.

Fernandez principally relies on the Austin Court of Appeals's opinion in *State v. Guzman* to support his argument that Officer Simmons did not have reasonable suspicion for stopping his pickup. 240 S.W.3d 362 (Tex. App.—Austin 2007, pet. ref'd). In *Guzman*, the defendant had spun his tires, and after the police officer saw smoke coming from the tires, he immediately pulled Guzman over for "exhibition of acceleration." *Id.* at 365. The Austin court held that at the time of Guzman's conduct, there was no exhibition of acceleration offense, and it also held that Guzman's conduct could not have created reasonable suspicion of speeding or DWI. *Id.* at 366–368. The court did not address whether Guzman's conduct could have qualified as reckless driving, and even if it had, the circumstances in *Guzman* are factually distinct from the facts here because Guzman did not fishtail into another lane of traffic with cars in his immediate vicinity.

For all of these reasons, we hold that the trial court did not err by concluding that Officer Simmons had reasonable suspicion that Fernandez committed reckless driving, and we overrule a portion of Fernandez's first issue

12

on that basis.[7]  Because we hold that the trial court did not err by concluding that the stop of Fernandez's pickup was justified on the reckless driving basis, we will not address whether Officer Simmons also had reasonable suspicion of his racing, DWI, or violating a city noise ordinance.[8]  *See* Tex. R. App. P. 47.1; *Rotenberry v. State*, 245 S.W.3d 583, 589 (Tex. App.—Fort Worth 2007, pet. ref'd).  Thus, we also overrule the remainder of Fernandez's first issue and his second issue.

---

[7] ... We clearly do not hold, as the dissenting opinion says that we do, that "it is not necessary for property or persons to be near enough for their safety to be at risk for a driver to violate the reckless driving statute" or that "merely allowing your tires to cross a lane line when no other car is near enough to be placed in danger is a violation of the law."  Dissenting Op. at 23.  We hold only that, viewing the testimony in the light most favorable to the trial court's ruling, Fernandez's fishtailing into another lane of traffic with cars in the *immediate vicinity* meets the requirements for a detention for reckless driving under the transportation code.

[8] ... We should avoid issuing advisory opinions on issues that do not affect the disposition of a case.  *See Ferrell v. State*, 968 S.W.2d 471, 474 (Tex. App.—Fort Worth 1998, pet. ref'd).  Thus, we will not address the dissenting opinion's lengthy analysis of whether the facts could justify reasonable suspicion of racing under the transportation code.  *See* Dissenting Op. at 6–11.

13

Conclusion

Having overruled Fernandez's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE


PANEL:  LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DAUPHINOT, J. filed a dissenting opinion.

PUBLISH

DELIVERED:  February 11, 2010



## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-388-CR

SAMUEL CENDEJAS FERNANDEZ                                    APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

------------

FROM COUNTY CRIMINAL COURT NO. 6 OF TARRANT COUNTY

------------

## DISSENTING OPINION

------------

Because I do not read the record in the same way as the majority, I would hold that the record does not support the trial court's denial of Appellant's motion to suppress and reverse the trial court's ruling.

I.  Background Facts

At about 2:15 a.m. on September 14, 2007, the two police officers were interviewing another driving while intoxicated (DWI) suspect at a 7-11 parking

lot in the 9100 block of Camp Bowie Boulevard in Fort Worth.[1] The officers'

testimony conflicts regarding exactly where Appellant began the driving that

drew their attention. As I read the record, they both heard the loud squeal of

tires. Officer Simmons heard the squeal and then looked up to see Appellant's

truck already on Camp Bowie Boulevard:

> Q. Okay. Once you heard this [squeal], did you also observe the
> vehicle that was causing the noise?
>
> A. Yes, ma'am.[2]

In response to the trial court's question, Officer Simmons testified that

Appellant was at a traffic light when he accelerated, causing the tires to

squeal.[3] Although there is no mention of it in the offense report, and indeed no

mention of it at any time prior to trial, even in discussions with his sergeant,

Officer Simmons announced for the first time at trial that he observed the

pickup "fishtailing" during the three seconds of acceleration.

---

[1] ... II R.R. at 5.

[2] ... *Id.* at 6.

[3] ... *Id.* at 21.

Sergeant Pelton testified that he saw Appellant's pickup "exiting a strip mall and they were peeling their tires, braking [sic] traction out on the roadway."[4]

> Q.    Okay.  So you heard the actual squealing or screeching of tires?
>
> A.    Yes, ma'am.
>
> Q.    Did you see anything or did you just hear it?
>
> A.    I just heard it.  I looked over, then I saw the—I saw the pickup truck exiting.[5]

Sergeant Pelton denied that he saw the pickup fishtailing and explained that he did not include the fishtailing in his report because he "didn't get that information at the scene."[6]

At the civil hearing regarding Appellant's driver's license suspension ("ALR hearing"), Sergeant Pelton testified that the reason Appellant was pulled over was that "it was 2:00 o'clock in the morning, he was in front of a nightclub, and that he peeled out . . . ."[7] There was no mention of fishtailing

---

[4] ... *Id.* at 23.

[5] ... *Id.* at 24.

[6] ... *Id.* at 28.

[7] ... *Id.* at 28–29.

3

in the offense report or at the ALR hearing. Indeed, there was no mention of fishtailing until the hearing on Appellant's motion to suppress.[8]

Sergeant Pelton admitted that he had no information "[o]ther than the fact that he was peeling out in front of the—or exiting the parking lot onto the roadway"[9] and that "peeling out does not violate the Texas Transportation Code."[10] Sergeant Pelton also testified that contrary to his testimony at the ALR hearing, the nearest bar was "actually a couple blocks down."[11] He testified that he had relied on Google Earth before trial to clarify where he had been in relation to the bar. "Actually, I didn't witness him leaving the bar. It was the strip mall adjacent to the 7-Eleven that I was at."[12] Officer Simmons had earlier testified that the nearest bar was about a mile away.[13]

When asked to confirm Officer Simmons's testimony that Appellant had been stopped at a traffic light, Sergeant Pelton could not. "There was a light there, but I—I couldn't say whether or not he was stopped at the light. I did

---

[8] ... *Id.* at 29.

[9] ... *Id.*

[10] ... *Id.*

[11] ... *Id.* at 30.

[12] ... *Id.*

[13] ... *Id.* at 9–10.

see him exiting the parking lot.  My focus went back to the person I was with."[14]

Sergeant  Pelton was able to testify that the squeal lasted "like, maybe, three—three seconds or so."[15]  It occurred when the pickup was moving from the parking lot to the roadway.  "[I]t would have been in transition."[16]  Sergeant Pelton explained that the lane Appellant pulled out into was lane two, the lane adjacent to the parking lot.[17]  Again, he reiterated that squealing one's tires is not a traffic offense.[18]

There was also testimony that there were cars in the parking lot that Sergeant Pelton believed Appellant had exited and speculation that somebody could have been starting a car at the time Appellant allegedly left the parking lot.[19]

As to creating danger for other vehicles, again, the testimony was speculative:

---

[14] *... Id.*

[15] *... Id.* at 31.

[16] *... Id.* at 33.

[17] *... Id.* at 34.

[18] *... Id.*

[19] *... Id.* at 8, 26.

5

Q. And if there had been cars there, he could have possibly hit them?

A. Yes, ma'am.[20]

## II. Findings of Fact and Conclusions of Law

The trial court adopted the State's proposed findings of fact and conclusions of law in toto with no changes or corrections.[21] Among the conclusions of law were conclusions that Officer Simmons had reasonable suspicion and probable cause to believe that Appellant was violating the transportation code. Specifically, the trial court concluded that Officer Simmons had both reasonable suspicion and probable cause to believe that Appellant was violating the reckless driving statute[22] and racing on the highway.[23] These conclusions are not supported by Officer Simmons's tentative testimony.

## III. Racing

Officer Simmons was the only witness who observed "fishtailing." He claimed that Appellant's tires or tire crossed the divider line "about maybe two

---

[20] ... *Id.* at 8–9.

[21] ... C.R. at 152–58.

[22] ... *See* Tex. Transp. Code Ann. § 545.401(a) (Vernon 1999).

[23] ... *See id.* § 545.420 (Vernon Supp. 2009).

feet."[24]  There is no video record of these events, and Officer Simmons testified that he could not remember whether his vehicle was equipped with an in-car video camera.  Officer Simmons believed that peeling out was a violation of the transportation code prohibition against "acceleration of speed, racing."[25]  The majority addresses only the reckless driving issue.  I believe the majority should also address the racing issue because the officer mistakenly believed that Appellant had violated that statute; because the trial court concluded as a matter of law that Appellant had violated that statute, justifying his detention; and because this conclusion, like the trial court's conclusion that the officer had reasonable suspicion and probable cause to believe that Appellant was violating the reckless driving statute, is wrong, leaving no valid basis for the stop or the denial of Appellant's motion to suppress.

This court has previously addressed the racing statute issue under similar circumstances.  In *Throneberry v. State*, Throneberry screeched his tires and fishtailed as he pulled out of an alley.[26]  We stated,

> The evidence . . . shows that Throneberry's act of "fishtailing" out of the alley is a misdemeanor offense under section 545.420 of the transportation code, which provides that "[a]

---

[24] ... II R.R. at 12.

[25] ... *Id.* at 11.

[26] ... 109 S.W.3d 52, 57–58 (Tex. App.—Fort Worth 2003, no pet.).

7

person may not participate in any manner in . . . an exhibition of vehicle speed or acceleration."  Though section 545.420 of the transportation code is entitled "Racing on Highway," courts have rejected the narrow interpretation that the statute only applies where a defendant is involved in some sort of a speed competition with another vehicle.  This same line of cases also holds that such offenses committed in an officer's presence or within his view create probable cause to arrest the defendant without a warrant.  Officer Ferguson testified that when he observed Throneberry's vehicle exit the alley at such a rate of speed as to cause the car to fishtail, he believed it was a traffic violation.  Accordingly, the jury could reasonably have believed that Throneberry committed an offense in Ferguson's presence or within his view by fishtailing from the alley into the street.[27]

But, as our sister court in Austin has explained, the racing statute has since been modified by the legislature:

> Prior to September 1, 2003, transportation code section 545.420 provided that "[a] person may not participate in any manner in: . . . (5) an exhibition of vehicle speed or acceleration or to make a vehicle speed record. "The State refers us to authority holding that this prohibition was not limited to exhibions of acceleration connected to a speed competition.  *See Throneberry v. State*, 109 S.W.3d 52, 57 (Tex. App.—Fort Worth 2003, no pet.).  But as amended in 2003, section 545.420 provides that "[a] person may not participate in any manner in:  . . . (5) in connection with a drag race, an exhibition of vehicle speed or acceleration or to make a vehicle speed record."

The State argues that the legislature did not intend this amendment to decriminalize exhibitions of acceleration that are not connected to speed competitions.  The best evidence of legislative intent, however, is the language of the statute.  We may go behind the statutory text only if it is ambiguous or if the application of the

---

[27] ... *Id.* (citations omitted).

statute's plain language would lead to an absurd result that the legislature could not possibly have intended. Section 545.420(a)(5), as it now reads and as it read on the night Guzman was stopped, is unambiguous. It plainly prohibits exhibitions of vehicle speed or acceleration in connection with a drag race. There is nothing absurd in reading the statute as written. The legislature may have always intended that this subsection apply only to speed competitions, or it may have come to believe that without this limitation, the statute was subject to abuse because any increase of vehicle speed could be construed as an exhibition of acceleration.

There is no evidence that Guzman was operating his pickup truck "over a common selected course, from the same place to the same place, for the purpose of comparing the relative speeds or power of acceleration of [his] vehicle . . . in a specified distance or time." The trial court correctly concluded that the spinning motion of Guzman's tire after the traffic light turned green did not alone warrant Scherbek's suspicion that Guzman was unlawfully exhibiting acceleration in violation of section 545.420.[28]

Similarly, although the officers in the case before us saw Appellant accelerate so quickly that his tires squealed, the tires produced a light smoke, and, for the first time at trial, Officer Simmons suddenly decided the vehicle fishtailed, there is no evidence that they observed Appellant operating his vehicle "over a common selected course, from the same place to the same place, for the purpose of comparing the relative speeds or power of acceleration of [his] vehicle . . . in a specified distance or time."[29] There is no evidence that

---

[28] _State v. Guzman_, 240 S.W.3d 362, 366–67 (Tex. App.—Austin 2007, pet. ref'd) (selected citations and footnotes omitted).

[29] Tex. Transp. Code Ann. § 545.420(b)(1)(B) (defining "drag race").

9

Appellant was in competition with any other vehicle. Indeed, Officer Simmons was unable to testify that Appellant was racing any other vehicle.[30]

Although the trial court found that Officer Simmons believed that Appellant was committing the traffic offense of rapid acceleration or racing,[31] and the trial court concluded as a matter of law that Officer Simmons had reasonable suspicion that Appellant was violating the racing statute,[32] the record does not support this finding and conclusion. Sergeant Pelton admitted that Appellant was not stopped for violating a noise ordinance or for fishtailing, but only for peeling out. Sergeant Pelton admitted that peeling out is not a violation of the Texas Transportation Code.[33] Officer Simmons did not observe a violation of the racing statute.

Although the majority is correct in stating that an officer may lawfully detain a driver when he reasonably believes that the driver has committed a traffic offense, "A trooper's incorrect belief that a motorist is in violation of

---

[30] ... II R.R. at 11.

[31] ... C.R. at 153.

[32] ... *Id.* at 155.

[33] ... II R.R. at 29.

10

state traffic laws is insufficient to justify a vehicle stop."[34] Officer Simmons's incorrect belief that Appellant had violated section 545.420 did not justify his stop of Appellant. The majority should have so held.

IV. Reckless Driving

The majority justifies the stop by holding that Officer Simmons had reasonable suspicion to believe that Appellant had violated the reckless driving statute and was justified in stopping Appellant to investigate whether he had, indeed, violated the statute. The record contains general testimony about the presence of other cars on Camp Bowie Boulevard at the time, but that testimony was in relation to whether Appellant could have been racing another car:

> Q. Okay. Could you tell me how many cars were immediately in the vicinity?
>
> A. Wasn't a lot of cars at that time. It was a few cars, but I say maybe three.
>
> Q. Okay. Now, was [Appellant] — was — did he appear to be racing those three other vehicles?
>
> A. I don't know.[35]

---

[34] ... *United States v. Granado*, 302 F.3d 421, 423 (5th Cir. 2002), *superseded on other grounds by statute as stated in United States v. Contrera-Trevino*, 448 F.3d 821, 823 (5th Cir.), *cert. denied*, 549 U.S. 981 (2006); *see also United States v. Lopez-Valdez*, 178 F.3d 282, 288 (5th Cir. 1999).

[35] ... II R.R. at 11.

11

There was no testimony that any cars were near enough to Appellant's vehicle to have been affected in any way by the three seconds of acceleration. Indeed, there was no evidence that those cars were on the same side of the curbed, grassy median or even on the roadway instead of in a parking lot. The majority speculates that the cars in the vicinity were actually on the roadway and on the same side of the grassy median as Appellant. There is no such evidence in the record. Unless the City of Fort Worth were evacuated or the street blockaded, there would always be cars somewhere on Camp Bowie Boulevard.

The majority does not, but should, take judicial notice of the fact that Camp Bowie Boulevard is a major boulevard that is more than ten miles long and is actually a segment of Highway 80 that, on its western end, merges into I-30 and then into I-20. We held more than fifty years ago, in a case involving Highway 80, that we may take judicial notice of that which "relates to boundaries and limits of counties within our jurisdiction, to the relation or contiguity of one county to another, as well as to *principal highways* and seats of county government."[36] "Highway nomenclature and designations within the trial court's jurisdiction are matters of common knowledge and proper subjects

---

[36] *Fairall v. Sutphen*, 296 S.W.2d 309, 311 (Tex. Civ. App.—Fort Worth 1956, no writ); *see also* Tex. R. Evid. 201.

12

for judicial notice."[37]  Courts "may take judicial notice of the location of cities, counties, boundaries, dimensions, and distances, because geographical facts such as these are easily ascertainable and capable of verifiable certainty."[38]

Indeed, at the State's request, this court went so far as to take judicial notice of Mississippi law in performing a sufficiency analysis, although there was never any proof of Mississippi law at trial or any request that the trial court take judicial notice.[39]  The officers relied on Google Earth, and Sergeant Pelton testified that Google Earth showed what businesses were at the location in question and where the nearest bar was located.  If the majority does not choose to take judicial notice of those geographical facts, they should at least take a page from Sergeant Pelton's book and take a look at Google Earth. Camp Bowie Boulevard is a major thoroughfare with multiple lanes on each side of a broad, curbed, mostly grassy median.

As this court has explained,

---

[37] _Apostolic Church v. Am. Honda Motor Co._, 833 S.W.2d 553, 555 (Tex. App.—Tyler 1992, writ denied).

[38] _1.70 Acres v. State_, 935 S.W.2d 480, 489 (Tex. App.—Beaumont 1996, no writ); _see also Butts Retail, Inc. v. Diversifoods, Inc._, 840 S.W.2d 770, 774 (Tex. App.—Beaumont 1992, writ denied).

[39] _See Tate v. State_, 120 S.W.3d 886, 889 (Tex. App.—Fort Worth 2003, no pet.).

The Fourth Amendment protects against unreasonable searches and seizures. To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. Once the defendant has made this showing, the burden of proof shifts to the State, which must then establish that the government agent conducted the search or seizure pursuant to a warrant or that the agent acted reasonably.[40]

When Appellant showed that there was no warrant, the presumption that the police acted properly was defeated, and the burden shifted to the State. In *Fowler*, we addressed the question of whether merely failing to maintain a single lane was a violation of the law or otherwise sufficient to justify the detention of the driver. Again,

An officer's reasonable suspicion of an alleged traffic violation cannot be based on a mistaken understanding of traffic laws. And an officer's honest but mistaken understanding of the traffic law which prompted a stop is not an exception to the reasonable suspicion requirement. Thus, Officer Knotts's misunderstanding that section 545.060(a) requires only crossing of the lane line—regardless of whether it is unsafe or dangerous to do so—will not support a reasonable suspicion.[41]

In *Fowler*, there was no evidence that the driver's allowing the tires to cross the lane line constituted a danger to anyone because there was no vehicle

---

[40] *Fowler v. State*, 266 S.W.3d 498, 501–02 (Tex. App—Fort Worth 2009, pet. ref'd) (citations omitted).

[41] *Id.* at 504–05 (citations omitted).

14

in the lane into which the tires crossed. Unlike the officer's in the case now before this court, the officer in *Fowler* admitted that the driving did not endanger anyone because there was no one there. In this case, although Officer Simmons admitted that Appellant's driving caused no property damage and did not endanger any pedestrian, and although he admitted that he could not testify that Appellant was speeding, he claimed that Appellant violated the reckless driving statute because "if there had been cars there, he could have possibly hit them."[42]

The majority holds that Officer Simmons had reasonable suspicion to believe that Appellant had committed the traffic offense of reckless driving, as the trial court concluded as a matter of law. The majority confuses the reasoning justifying a *Terry* stop with the law allowing an officer to detain a person who commits an offense in the officer's presence. *Terry v. Ohio* stands for the rule that

> in dealing with the rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess. For this purpose it is urged that distinctions should be made between a "stop" and an "arrest" (or a "seizure" of a person), and between a "frisk" and a "search." Thus, it is argued, the police should be allowed to "stop" a person and detain him briefly for questioning upon suspicion that he may be connected

---

[42] ... II R.R. at 9.

15

with criminal activity. Upon suspicion that the person may be armed, the police should have the power to "frisk" him for weapons. If the "stop" and the "frisk" give rise to probable cause to believe that the suspect has committed a crime, then the police should be empowered to make a formal "arrest," and a full incident "search" of the person. This scheme is justified in part upon the notion that a "stop" and a "frisk" amount to a mere "minor inconvenience and petty indignity," which can properly be imposed upon the citizen in the interest of effective law enforcement on the basis of a police officer's suspicion.[43]

That is, "[i]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with" criminal activity, they may "*investigate that suspicion*" by making "*a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information.*"[44]

The police may seek further information regarding the suspicious activity. If the police see someone loitering near a broken window of a closed business, the police may investigate the possibility of a burglary. If the police see someone that they believe to be too young to lawfully operate a vehicle, they may stop the driver to ascertain his age. But the police may not detain the driver to investigate whether he might have participated in a burglary

---

[43] ... 392 U.S. 1, 10–11, 88 S. Ct. 1868, 1874 (1968) (footnotes omitted).

[44] ... *United States v. Hensley*, 469 U.S. 221, 229, 232, 105 S. Ct. 675, 680, 682 (1985) (emphasis added) (citation omitted).

16

somewhere at some time. An officer may not detain the suspicious loiterer to determine whether he ever operated a motor vehicle when he was too young to be issued a driver's license. The purpose of the investigation at its inception must be to obtain further information regarding the suspicion justifying the warrantless detention.

The majority is correct that an officer may stop a vehicle if he reasonably suspects the driver has committed, is committing, or soon will commit an offense. Additionally, the detention is not unlawful if, after investigation, the officer concludes the driver did not commit that offense. But the officer must reasonably suspect criminal activity that can be ascertained with further investigation. That is, when an officer suspects speeding or failure to signal a turn, nothing more can be learned from further investigation. The officer either saw it, or he did not. Of course, there are traffic offenses that can be determined by further investigation, such as learning whether the driver is too young to lawfully operate a vehicle. Also, the officer may reasonably suspect an expired inspection sticker or license plate or that the window-tinting exceeds lawful limits, detain the driver and vehicle for further investigation, learn that he is wrong but view contraband in plain view inside the vehicle or determine that the driver is intoxicated, and the stop will not be held to be unlawful because the officer did not view a traffic offense. But the detention must be

17

justified at its inception, and the search or seizure must be reasonably related to the circumstances that justified the stop. Whether a driver was speeding, failed to signal a turn, or drove recklessly is not a circumstance that can be clarified by detention and further investigation.

The Fifth Circuit instructs us regarding traffic stops:

> [W]e analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated in *Terry v. Ohio*. This standard is a two-tiered reasonable suspicion inquiry: 1) whether the officer's action was justified at its inception, and 2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place. In addition, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."
>
> However, once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion. "At that point, continuation of the detention is no longer supported by the facts that justified its initiation."[45]

Here, the majority, consistent with Officer Simmons's testimony, states that Officer Simmons stopped Appellant because he suspected that Appellant might have committed a traffic offense and wanted to investigate his reasonable suspicion that Appellant might have committed a traffic offense.

---

[45] ... *United States v. Valadez*, 267 F.3d 395, 397–98 (5th Cir. 2001) (citations omitted).

18

Frankly, I don't understand how this reasoning comports with the law. As the Supreme Court pointed out,

> Once Knowles was stopped for speeding and issued a citation, all the evidence necessary to prosecute that offense had been obtained. No further evidence of excessive speed was going to be found either on the person of the offender or in the passenger compartment of the car.[46]

Officer Simmons suspected that Appellant was either driving recklessly or was racing. No investigation after detaining the vehicle would provide more evidence of reckless driving or racing. Simmons did not testify that he reasonably suspected that Appellant was intoxicated. The majority speculates that Officer Simmons may have had questions stemming from what he had just witnessed, such as whether something was wrong with the driver, the driver's car, or the car's tires that caused the apparent reckless driving. That is, the majority speculates that Officer Simmons could have been combining a community caretaking function with a criminal investigation function. Of course, this would be improper. Community caretaking must be totally divorced from gathering evidence of a criminal act.[47] There was no evidence to

---

[46] *Knowles v. Iowa*, 525 U.S. 113, 118, 119 S. Ct. 484, 488 (1998) (citations omitted).

[47] *Corbin v. State*, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002).

preserve, and there was no need to detain Appellant to search for weapons. Under these circumstances, the detention was not justified.

Cobbling together disparate rules to justify the detention, the majority relies on *Terry* to hold that reasonable suspicion justifies a stop to gather more information about the suspected offense but applies the rule to a traffic offense that is not susceptible of further investigation.[48] This approach leads to a result not justified by case law or either the state or the federal constitution.

The majority holds that Appellant may have violated the reckless driving statute. As the majority correctly states, "There were no cars in the specific lane of traffic that [Appellant] fishtailed into at the precise time that he did so."[49] But a close reading of the record also shows that there is no evidence of another vehicle, pedestrian, property, or animal near Appellant's vehicle during the three seconds of acceleration. Indeed, as stated earlier, the two police officers were not in agreement regarding exactly where Appellant began the driving that drew their attention. They both heard the loud squeal of tires.[50] Officer Simmons believed that Appellant was at a traffic light.[51] Sergeant Pelton

---

[48] *See Terry*, 392 U.S. at 10–11, 88 S. Ct. at 1874.

[49] Majority op. at 9.

[50] II R.R. at 5.

[51] *Id.* at 21.

20

believed that Appellant's vehicle was leaving a strip mall parking lot.[52]  If Appellant was indeed pulling out of a parking lot, what Officer Simmons believed was fishtailing could have been nothing more than the natural movement of a vehicle turning right out of a parking lot into the adjacent lane.

Sergeant Pelton observed a turn but no fishtailing.  Clearly, it was up to the trial court to decide which officer to believe.  But even if Officer Simmons's testimony were believed in its entirety, he nevertheless did not testify to any actual traffic violation—only the suspicion of a violation based on a misunderstanding of the law.  Sergeant Pelton did not agree that Officer Simmons should have pulled Appellant over.  Sergeant Pelton testified that the traffic stop was premature and that he would have followed Appellant to watch his driving.[53]

There was vague testimony that there were other cars on Camp Bowie Boulevard at the time, but there was no clear testimony that there were cars near enough to Appellant's vehicle to be endangered.  There was testimony that there were cars in the parking lot that Officer Pelton believed Appellant had

---

[52] *Id.* at 23.

[53] *Id.* at 25, 28, 35.

21

left and speculation that somebody could have been starting a car at the time Appellant left the parking lot.[54] Given the question posed to Officer Simmons,

> Q. And if there had been cars there, he could have possibly hit them?
>
> A. Yes, ma'am[,][55]

the only logical inference from the evidence is that the vehicles were not near enough to Appellant to be affected by the fishtailing. There was testimony that no vehicle was in the adjacent lane.

Section 545.401 of the transportation code, the reckless driving statute, provides, "A person commits an offense if the person drives a vehicle in wilful or wanton disregard for the safety of persons or property."[56] As our sister court in Houston has pointed out, "In the context of reckless driving, 'willful and wanton disregard' means the 'deliberate and conscious indifference to the safety of others.'"[57] By its very language, the statute requires that there be persons or property near enough to the person's vehicle to have their safety disregarded. A person speeding on I-35 does not do so in wilful or wanton

---

[54] ... *Id.* at 8, 26.

[55] ... *Id.* at 9.

[56] ... Tex. Transp. Code Ann. § 545.401(a) (Vernon 1999).

[57] ... *Brown v. State*, 183 S.W.3d 728, 733 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

22

disregard for the safety of persons driving on I-95. A person spinning donuts on an ice-covered parking lot at Texas Christian University does not do so in wilful or wanton disregard for the safety of persons driving down Congress Avenue in Austin. A person peeling out on Camp Bowie Boulevard does not constitute a threat to persons or property on the far side of the wide grassy median or in any area other than the immediate vicinity of the vehicle.

We must remember that the burden to justify a warrantless detention rests squarely on the State. The State must present evidence to prove, not that there is some circumstance in which the detention could have been lawful, but that the detention actually was lawful. The burden was not on Appellant to negate every possible scenario that would justify the detention. Officer Simmons thought he had observed a traffic violation, but he was wrong.

I agree with Officer Pelton: Officer Simmons stopped Appellant prematurely and needed more than he observed to justify Appellant's detention. Because the majority holds that (1) the stop was lawful because Simmons reasonably suspected that Appellant might have committed a traffic offense that needed to be investigated when there was nothing to investigate by a detention, (2) it is not necessary for property or persons to be near enough for their safety to be at risk for a driver to violate the reckless driving statute, (3) that merely allowing your tires to cross a lane line when no other car is near

23

enough to be placed in danger is a violation of the law, and (4) that three seconds of screeching tires and fishtailing absent evidence of traffic, pedestrians, animals, or property that could have been put at risk is sufficient to show reckless driving, I must respectfully dissent.

LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: February 11, 2010