COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-08-336-CR

 

 

SHANNON
WILLIAMS                                                                        APPELLANT

 

                                                             V.

 

THE
STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

           FROM COUNTY CRIMINAL
COURT NO. 2 OF TARRANT COUNTY

 

                                                       ------------

 

                                                      OPINION

                                                       ------------

                                               I.  Introduction        

A jury found Appellant Shannon
Williams guilty of driving while intoxicated (DWI), and the trial court
assessed his punishment at sixty days in jail, probated for eighteen months,
and a $750 fine.  In two points, Williams
contends that the evidence is factually insufficient to sustain his conviction
and that the trial court erred by including the per se theory of intoxication
in the jury charge.  We will affirm.








II.  Factual
and Procedural Background

One night at approximately 1:18 a.m.,
Officer Nicholas Brown of the Fort Worth Police Department saw Williams=s vehicle run a red light and change
lanes without signaling.  Officer Brown
activated his overhead lights and stopped Williams.  Officer Brown noticed that Williams had a Aheavy odor of alcohol about him,@ bloodshot eyes, and slurred
speech.  Officer Brown asked Williams if
he had been drinking, and Williams said he had consumed three or four beers
that night.

Officer Brown called for a DWI Unit[1]
and spoke with Officer Dena Evans, a DWI investigator who asked Officer Brown
to begin field sobriety tests until she arrived.  Officer Brown administered the horizontal
gaze nystagmus test on Williams and, based on Williams=s performance, concluded that
Williams had alcohol in his system.  When
Officer Brown asked Williams to perform the walk and turn test, Williams
refused and Ajust turned around, put his hands
behind his back[,] and said, >I=m not doing anything else.=@  Officer Brown
arrested Williams.








Officer Evans arrived at 1:36 a.m.
and put Williams in her patrol car.  She
smelled an odor of alcohol on him.  While
en route to the jail, Williams lay down in the backseat of the patrol car.  Officer Evans testified that A[Williams] was definitely passed out.@ 
When they arrived at the jail, Williams told Officer Evans that he was
going to throw up and to hurry and let him out. 
Williams threw up in the sally port.

Officer Evans took Williams to the intoxilyzer
room, where she had him perform the one-leg stand and walk-and-turn tests.  Officer Evans testified that Williams was
slow to respond to her instructions during the field sobriety tests.  Williams swayed during the one-leg stand
test.  He could not keep his balance
while listening to directions and while performing the walk-and-turn test, and
he had to reach for the wall for support at one point.

Williams took the intoxilyzer test at
approximately 2:46 a.m. and 2:48 a.m., about ninety minutes after Officer Brown
had stopped him; the results of both tests showed that his alcohol
concentration was 0.097 at that time.








Williams was charged by information
with DWI Aby not having the normal use of his
mental or physical faculties by reason of the introduction of alcohol into his
body or by having an alcohol concentration of at least 0.08.@[2] 
At trial, Officer Brown, Officer Evans, and the senior forensic chemist
for the Tarrant County Medical Examiner=s office testified for the State.  The State played two videotapes for the
jury.  State=s Exhibit 1 is a videotape of the
beginning of Officer Brown=s stop of Williams.[3]  State=s Exhibit 3 is a videotape of the inside of Officer Evans=s car while she transported Williams
to the jail and of Williams performing the field sobriety tests inside the
intoxilyzer room.  The State also
introduced the results of Williams=s intoxilyzer tests.

After both sides rested, Williams
objected to the inclusion of the per se theory of intoxication in the jury
charge, claiming that the State had failed to present any evidence that his
alcohol concentration was 0.08 or more Aat the time Mr. Williams was driving.@ [Emphasis added.]  The trial court overruled his objection and
charged the jury on both the impairment and per se theories of
intoxication.  The jury entered a general
verdict of Aguilty@ without specifying which definition of intoxication it found
applied to Williams.

III.  Factual
Sufficiency of the Evidence

In his second point, Williams argues
that factually insufficient evidence existed that he was intoxicated under
either of the two statutory definitions of intoxication.  Specifically, Williams contends that Athe State enjoyed a lower standard
when attempting to prove the [impairment] definition of intoxication because
the jury was allowed to consider convicting on insufficient evidence@ and that factually insufficient
evidence existed that his alcohol concentration was 0.08 or more for the per se
definition of intoxication.








A.  Standard of Review

When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Neal v. State, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), cert.
denied, 129 S. Ct. 1037 (2009); Watson v. State, 204 S.W.3d 404, 414
(Tex. Crim. App. 2006).  We then ask
whether the evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the factfinder=s determination is clearly wrong and manifestly unjust or
whether conflicting evidence so greatly outweighs the evidence supporting the
conviction that the factfinder=s determination is manifestly
unjust.  Lancon v. State, 253
S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204 S.W.3d at 414B15, 417.  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, though legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at
417.








In determining whether the evidence
is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of
reasonable doubt to overturn [the] conviction.@  Id.  We cannot conclude that a conviction is
clearly wrong or manifestly unjust simply because we would have decided
differently than the jury or because we disagree with the jury=s resolution of a conflict in the
evidence.  Id.  We may not simply substitute our judgment for
the factfinder=s. 
Johnson v. State, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); Cain
v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be
given contradictory testimonial evidence because resolution of the conflict Aoften turns on an evaluation of
credibility and demeanor, and those jurors were in attendance when the testimony
was delivered.@ 
Johnson, 23 S.W.3d at 8. 
Thus, unless we conclude that it is necessary to correct manifest
injustice, we must give due deference to the factfinder=s determinations, Aparticularly those determinations
concerning the weight and credibility of the evidence.@ 
Id. at 9.  Our deference in
this regard safeguards the defendant=s right to a trial by jury.  Lancon, 253 S.W.3d at 704.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s complaint on appeal.  Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003).  The existence of
an alternative reasonable hypothesis may be relevant to, but is not
determinative in, a factual review.  Wilson
v. State, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999).

B.  Factually Sufficient Evidence








The impairment and per se theories of
intoxication do not involve separate violations of the law.  Bagheri v. State, 119 S.W.3d 755, 762
(Tex. Crim. App. 2003).  Instead, they
set forth Aalternate means by which the State
may prove intoxication, rather than alternate means of committing the
offense.@ 
Id.  When a trial court
submits alternate means by which the State may prove intoxication, the evidence
is sufficient to support a general verdict of Aguilty@ if it is sufficient to prove any one
of the alleged means.  Id. at 762
n.5; Reardon v. State, 695 S.W.2d 331, 334 (Tex. App.CHouston [1st Dist.] 1985, no
pet.).  Consequently, in a factual
sufficiency review, factually sufficient evidence of either theory of
intoxication will support the jury=s finding of guilt.  See Bagheri, 119 S.W.3d at 762 n.5.

Here, because the jury could convict
Williams if it found that he was driving while intoxicated under either the
impairment or per se definition of Aintoxicated@ and because the jury entered a
general verdict of Aguilty,@ factually sufficient evidence of either theory will support
the jury=s finding.  See id.  egarding the impairment definition of Aintoxicated,@ the evidence at trial demonstrated
that Williams ran a red light and changed lanes several times without
signaling.  Officer Brown testified that
Williams smelled of alcohol; that he had red, bloodshot eyes; and that he
slurred his speech.  The officer said
that Williams had told him that he had consumed alcohol that evening.  The officer also explained that Williams had
failed the horizontal gaze nystagmus test, showing that he in fact had alcohol
in his system.  Officer Brown further
testified that Williams had to lean against his vehicle for balance when
talking to Officer Brown.








Officer Evans also smelled alcohol on
Williams.  She testified that Williams
passed out on the way to the jail, and the videotape of Officer Evans=s car shows that Williams lay down in
the back of the officer=s car during the ride to the jail.[4]  Williams vomited when they arrived at the
jail, and Officer Evans testified that his vomit smelled like alcohol.  Officer Evans explained that during the field
sobriety tests in the intoxilyzer room, Williams swayed and could not keep his
balance.  At one point, Williams had to
grab the wall behind him to keep his balance while listening to the officer=s instructions.[5]








Williams appears to argue that the
State had a lower standard of proof regarding the impairment theory of
intoxication because the jury could consider the results of Williams=s intoxilyzer tests.  The intoxilyzer results showing that Williams=s alcohol concentration was 0.097
ninety minutes after his arrest, however, provided further evidence that
Williams had consumed alcohol that night and were relevant to both theories of
intoxication.  See State v. Mechler,
153 S.W.3d 435, 440 (Tex. Crim. App. 2005) (noting that results of intoxilyzer
tests are probative of both per se and impairment theories of intoxication
because they indicate whether defendant had consumed alcohol); Stewart v.
State, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004) (same); see also Maxwell
v. State, 253 S.W.3d 309, 316B17 (Tex. App.CFort Worth 2008, pet. ref=d) (holding, in sufficiency analysis,
that absence of extrapolation evidence was irrelevant to jury=s finding of guilt because jury was
charged on both theories of intoxication).

Williams testified at trial and
offered another explanation for some of his actions that night.  He explained that he had eaten some sushi at
a party, had felt sick, and had run the red light on purpose so that he could
get home to throw up.[6]  He also explained that he had changed lanes
without using a blinker because he saw Officer Brown=s car, thought the officer was in a
hurry, and wanted to get out of his way. 
Although the jury could have found Williams=s testimony to be true, the mere
existence of a reasonable alternative hypothesis for his running a red light,
changing lanes without signaling, and throwing up does not render the evidence
factually insufficient.  See Wilson,
7 S.W.3d at 141; Love v. State, 199 S.W.3d 447, 454 (Tex. App.CHouston [1st Dist.] 2006, pet. ref=d).








We have reviewed the evidence in a
neutral light and have given due deference to the jury=s determinations, particularly those
regarding the witnesses= demeanor and credibility.  We find no objective basis in the record to
hold that the jury=s verdict was clearly wrong or
manifestly unjust or that it was contradicted by the great weight and
preponderance of the evidence.  See
Lancon, 253 S.W.3d at 704; Watson, 204 S.W.3d at 414B15, 417.  Rather, the evidence presented at trial was
sufficient to support the verdict, and no contrary evidence exists that would
render the evidence factually insufficient under the applicable standard of
review.  See Lancon, 253 S.W.3d at
704; Watson, 204 S.W.3d at 414B15, 417.  Accordingly,
we hold that the evidence is factually sufficient to support Williams=s conviction.[7]  We overrule his second point.








                                               IV.  Jury Charge

In his first point, Williams contends
that the trial court erred by including the per se theory of intoxication in its
charge to the jury because the State presented insufficient evidence to show
what his alcohol concentration was at the time he was driving.

Appellate review of error in a jury
charge involves a two-step process. Abdnor v. State, 871 S.W.2d 726, 731
(Tex. Crim. App. 1994).  Initially, we
must determine whether error occurred.  See
id. at 731B32. 
If so, we must then evaluate whether sufficient harm resulted from the
error to require reversal.  Id.

The jury charge must distinctly set
forth the law applicable to the case.  See
Tex. Code Crim. Proc. Ann. art. 36.14 (Vernon 2007).  The trial court errs when it charges the jury
on a theory of conviction that is not supported by the evidence.  Sanders v. State, 814 S.W.2d 784, 787
(Tex. App.CHouston [1st Dist.] 1991, no pet.).

Here, as we explained in our factual
sufficiency review above, the results of intoxilyzer tests are relevant to both
theories of intoxication because they may show that a defendant has consumed
alcohol and thus Atend to make it more probable that
[the defendant] was intoxicated at the time of driving.@ 
Mechler, 153 S.W.3d at 440; see Stewart, 129 S.W.3d at
96.  The court of criminal appeals
recently explained,








BAC‑test
results, even absent expert retrograde extrapolation testimony, are often
highly probative to prove both per se and impairment intoxication.[[8]]  However, a BAC‑test result, by itself,
is not sufficient to prove intoxication at the time of driving.  There must be other evidence in the record that
would support an inference that the defendant was intoxicated at the time of
driving as well as at the time of taking the test. . . .  Other evidence that would logically raise an
inference that the defendant was intoxicated at the time of driving as well as
at the time of the BAC test includes, inter alia, erratic driving, post‑driving
behavior such as stumbling, swaying, slurring or mumbling words, inability to
perform field sobriety tests or follow directions, bloodshot eyes, any
admissions by the defendant concerning what, when, and how much he had been
drinkingCin short, any and all of the usual indicia of
intoxication.

 

In sum, the evidence is sufficient to
support a jury charge on the Aper se@ theory of intoxication if it includes either (1) expert
testimony of retrograde extrapolation, or (2) other evidence of intoxication
that would support an inference that the defendant was intoxicated at the time
of driving as well as at the time of taking the test.

Kirsch v. State, No. PD-0379-09, 2010 WL 447437, at *4B5 (Tex. Crim. App. Feb. 10, 2010).[9]








Here, the jury heard evidence that
Williams ran a red light and changed lanes without signaling; smelled of
alcohol; had red, bloodshot eyes; slurred his speech; leaned on his vehicle for
balance; and said he had consumed alcohol that evening.  The jury also heard evidence that Williams
passed out on the way to the jail, vomited upon arrival, and failed field
sobriety tests.  Following Kirsch,
we hold that this evidence Asupport[s] an inference that [Williams]
was intoxicated at the time of driving as well as at the time of taking the
breath test.@ 
Id.  Consequently, the
intoxilyzer results, when coupled with the other evidence at trial, were
sufficient to support a jury charge on the Aper se@ theory of intoxication.  See id.  We overrule Williams=s first point.

                                                V.  Conclusion

Having overruled both of Williams=s points, we affirm the trial court=s judgment.

 

SUE
WALKER

JUSTICE

 

PANEL: DAUPHINOT,
WALKER, and MCCOY, JJ.

 

DAUPHINOT, J. filed
a dissenting opinion.

 

PUBLISH

 

DELIVERED: March 4,
2010



_______________________________________________________________________________________




 

 











 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

                                                              NO. 2-08-336-CR

 

 

SHANNON
WILLIAMS                                                                        APPELLANT

 

                                                             V.

 

THE
STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

           FROM COUNTY CRIMINAL COURT
NO. 2 OF TARRANT COUNTY

 

                                                       ------------

 

                                         DISSENTING OPINION

 

                                                       ------------

I write separately because I do not
understand the record in the same way the majority understands it, and I find
that record terribly disturbing.  The
majority accurately reports and relies on the testimony at the trial, but the
testimony is contradicted by the video record of the actual events.








Patrol Officer Nicholas Brown pulled
Appellant Shannon Williams over and then called for the officer who was trained
to investigate suspected offenses of driving while intoxicated (DWI), even
though he was trained to conduct the horizontal gaze nystagmus (HGN) test.  Officer Brown=s car either had no microphone or had the microphone turned
off.  He testified, 

Q.      Now, officers do
have mikes [sic], don=t they?

A.      Some of the vehicles are equiped [sic]
with them, some 

aren=t.

 

Q.      And this vehicle
is not equiped [sic] with a mike [sic]?

A.      I believe
not.  I don=t recall.  If it
did have one, I would have been wearing it.

 

Q.      So
if there was a mike [sic], we could have heard his voice, correct?

A.      Yes, sir.@[1]

Officer Brown testified that there
was a video camera, but he Aran out of tape@ before the film could capture
Appellant=s ability to walk and to exhibit
whether he had lost the normal use of his mental or physical faculties at the
time he was operating the motor vehicle. 
Officer D. Evans, the second officer, believed that she had turned her
car=s microphone off.  She was mistaken.  The regularity with which the units working
the Camp Bowie area have no dash cameras or have malfunctioning equipment or
officers who cannot remember whether they did not have the equipment or simply
chose not to use it is, indeed, disturbing.








Officer Brown of the Fort Worth
Police Department was on duty in approximately the 9100 block of Camp Bowie
Boulevard at approximately 1:18 a.m. on October 19, 2007.  He testified that he saw a blue pickup driven
by Appellant and traveling west on Camp Bowie run a red light at the
intersection of Camp Bowie and Normandale. 
Officer Brown pulled his patrol vehicle behind the pickup and began to
follow it.  He said that he saw Appellant
change lanes twice without signaling. 
Officer Brown then activated his dash camera.  The video shows the blue pickup pull on to
the access road of Loop 820 and then pull over to the side of the road without
incident.  Officer Brown testified that
he smelled the odor of alcohol and that Appellant had bloodshot eyes and
slurred speech.  Although there is no
sound on the videotape, Officer Brown testified that in response to his
questions, Appellant said that he had consumed three or four beers.  Officer Brown testified that he had asked
Appellant for his driver=s license and insurance and that
Appellant had no problem providing the driver=s license.  Officer
Brown had no independent recollection of Appellant=s providing the insurance
information.

Officer Brown called for a DWI unit
and spoke with Officer Evans, who told him that she was some distance away and
asked him to go ahead and perform the field sobriety tests.  At some point, while Officer Brown was in his
unit and Appellant was still in his pickup, the video recording in Officer
Brown=s car stopped.








Officer Brown denied that Appellant
had any particular problem getting out of the pickup or that he had to hold on
to the pickup to maintain his balance. 
He did claim that Appellant at some point was forced to lean against the
pickup to maintain his balance.  Again,
these actions are not reflected on the videotape because it had already
stopped.  According to his testimony,
Officer Brown administered the HGN test, concluding that Appellant had alcohol
in his system and scored six Aclues@ of intoxication. 
Officer Brown testified that at that point, Appellant said that he was
not going to perform any further tests and put his hands behind his back to be
handcuffed.

Appellant testified that he had been
at a birthday party for a short time, approximately two hours, and had eaten
some sushi that had made him sick.  He
testified that he told Officer Brown that he was feeling sick and could not
continue the field sobriety tests.  Of
course, because the video equipment in Officer Brown=s car had stopped, the evidence at
this point was a swearing match. 
Appellant also testified that as he was driving west on Camp Bowie,
Officer Brown pulled out of a parking lot and followed very closely behind
him.  Assuming that Officer Brown wanted
to pass him, Appellant pulled over into a different lane.  When Officer Brown did not make an attempt to
pass him, Appellant pulled back into his lane in preparation for entering the
access road for Loop 820 because he was intending to return home by way of the
loop.  The videotape does reveal that
Appellant did not signal any lane changes. 
There were no vehicles around, other than Officer Brown=s, and there was no testimony or
other evidence that Appellant could not change lanes safely without signaling.








Officer Brown testified that he had pulled
Appellant over because of his running a red light and his erratic driving.  Appellant admitted that he ran a red light,
and he does not challenge the original stop. 
But the limited amount of driving recorded on the videotape is neither
erratic nor unsafe and in no way indicative of intoxication. 

Officer Evans testified that she
arrived at the scene of the traffic stop at 1:36 a.m.  She took custody of Appellant and placed him
in the back of her patrol car.  Officer
Evans testified that she smelled the odor of alcohol on Appellant, that his
eyes were bloodshot, and that his speech was slurred.  She also testified that he passed out in the
back seat of her vehicle.  She further
testified that the microphone in her car was not on. 








I have closely reviewed the videotape
from Officer Evans=s car and find that, indeed, the
microphone was turned on.  One can hear
Appellant speaking.  His speech is not
slurred.  Indeed, his speech is clear,
cogent, and coherent.  He asks the
officers to retrieve his billfold from his truck.  He explains that he owns his own business and
needs the billfold.  He describes the
billfold as being brown and looking like a large checkbook and tells the
officers how much he appreciates their getting it for him.  He asks what is going to happen to him and
explains that he has never been in any kind of trouble before.  He tells the officers that his handcuffs are
too tight and are making his hands numb. 
He asks if they will cuff his hands in front.  They, of course, refuse.  We see him lie down on the back seat, but he
has not passed out.  Indeed, he continues
to speak.  He asks what is going to
happen to him and what the next procedures will be.  He asks if he can get someone to come get it,
presumably his truck in the context of the events.  After a short time, he thanks Officer Evans
for turning on the air for him.  There is
a period of silence while someone drives the patrol car.  Officer Evans does not speak to Appellant,
and he neither speaks nor sings to her. 
There is no sound of snoring, and Appellant is not visible.  Neither Officer Evans nor the majority
suggests that she has passed out because she does not speak and is not visible
on the tape.

As the car pulls into the sally port,
Appellant says that he feels very sick and asks the officer to stop because he
feels that he is going to vomit.  His
speech is not slurred, nor does he sound inebriated.  He then asks the officer to please let him out
of the car because he feels that he is going to vomit.  Nowhere is Officer Evans=s testimony that Appellant passed out
or that his speech was slurred supported by what we see or hear on the
videotape.  In fact, her testimony is
contradicted by what we see and hear.

When Officer Evans pulled into the
sally port at the jail, she opened the car=s back door for Appellant, and he was allowed to vomit
outside the police car.  Nothing in the
record suggests that Appellant was given anything to drink or anything with
which to rinse the vomit out of his mouth before he submitted to the intoxilyzer
test.








Officer Evans took Appellant inside
the jail to the intoxilyzer room.  The
events in the intoxilyzer room were videotaped. 
Again, the difference between the officer=s description of Appellant=s performance on the field sobriety tests and the performance
revealed on the videotape suggests that we are talking about totally different
cases.  At trial, Officer Evans described
Appellant as unable to stand without swaying or holding on to the wall and
unable to properly perform the field sobriety tests.  The videotape reveals that Appellant swayed
less than the officer and that Appellant performed substantially better than
she did on the field sobriety tests.

At trial, Officer Evans stated that
Appellant was unable to maintain a stance with one foot in front of the other,
but the videotape shows that she took an inordinately long time explaining the
test, repeating herself, while instructing him to stand in a very unnatural
position that he eventually abandoned while he waited for her again to repeat
the instructions.  When Appellant did
perform the test, he performed quite well. 
The video also demonstrates that his speech is not slurred, although he
does appear quite tired.

Officer Evans testified that
Appellant had a slow response to instructions, justifying her conclusions that
he had lost the normal use of his mental faculties.  The video shows that every time he attempted
to respond to her instructions, she told him to wait because she was not finished
instructing him.  Appellant did tell
Officer Evans that he felt claustrophobic. 
Officer Evans opened the door to the intoxilyzer room.

Appellant agreed to take a breath
test, and the test revealed a blood alcohol concentration of 0.097 at 2:46
a.m., approximately ninety minutes after Appellant was pulled over.  Appellant was ultimately charged with DWI by
not having the normal use of his mental or physical faculties by reason of the
introduction of alcohol into his body or by having an alcohol concentration of
at least 0.08.








The majority relies on the officers= testimony to the exclusion of the
contradictory evidence of the video record. 
While determinations of credibility are the exclusive province of the
trier of fact,[2]
an objective record of the actual events that contradicts the testimony must
mean that the record does not support the trial court=s determination of facts.

Repeatedly, we are asked to review
records of DWI stops during which there is no audio or video record of the
event.  In Cendejas-Fernandez v. State,
concerning another DWI stop in the 9100 block of Camp Bowie, the officer could
not remember whether he had failed to turn on his camera or whether he had no
camera.[3]  In Helm v. State, the officer provided
neither audio nor video record of the detention.[4]  And so it goes on Camp Bowie in Fort Worth.








Why do I believe there should be
audio or audio and video record of the DWI stops?  Because the law requires, and did so at the
time of this stop, either an audio or audio and video record or the filing of a
racial profiling report for each stop.[5]  The City of Fort Worth has conscientiously
provided the means for complying with this law. 
Since at least 2004, Fort Worth has been providing in-car video cameras
to police officers:  

The Police
Department currently has cameras in more than 240 marked Police vehicles.  These include all Front Line Patrol (Beat)
Vehicles, Traffic Division DWI unit, Commercial Vehicle Enforcement unit, and
twelve vehicles assigned to Zero Tolerance Teams.  The number of cameras nearly doubled during
FY2004 due to a State grant that provided 99 additional units.  This program will continue equipping vehicles
requiring in-car video cameras increasing from 181 to 249 Front Line Patrol
(Beat) Vehicles in FY2008-2009. 

 

The Police Department
will begin equipping Digital In-Car Video systems in FY09.  The quantity of the Digital systems will be
limited while tests and evaluations of various models are conducted.  This will allow the department to ensure that
the equipment meets the requirements of the Police Department, as well as the
Prosecutors [sic] Office, maximizing the ability to prosecute cases using
recorded video evidence.[6]

 

I cannot agree with the majority that there is no conflict between the testimonial
evidence and the record of the actual events. 
An appellate court should give no weight to testimony that is disproved
by the objective record of the actual events. 
And I believe that the majority should address the issue of an officer=s intentionally disabling the audio
recorder and testifying directly contrary to the audio record.








At some point, courts must address the repeated failure of officers to
use the recording equipment and their repeated inability to remember whether the
car they were driving on patrol or to a DWI stop contained the video equipment
the City of Fort Worth has been paying for. 
If the law requires recording to qualify for the exception to filing
racial profiling reports,[7] then is the
officer not obligated to make sure that there is tape in a traditional video
camera or that a digital camera is activated? 
When the actual recording conflicts with the officer=s testimony, the defendant=s testimony, or another witness=s testimony, a court cannot pretend
that the emperor is wearing new clothes just because someone testifies that he
is.








The issue before this court is whether Appellant was intoxicated at the
time he operated a vehicle in a public place, not whether the alcohol
concentration in his body was above .08 ninety minutes after he stopped
driving.  Both officers had microphones
and a video camera, yet we have no video record of Appellant=s control of his physical faculties
at the scene.  Given Officer Evans=s testimony that her microphone was off,
we are fortunate to have an audio record. 
That accidental record reveals no indication of inebriation on Appellant=s part.  I must respectfully disagree with the
majority that lying down is evidence of intoxication, especially in light of
the fact that when Appellant was sitting up against the back of the seat, he
had indicated that having his hands handcuffed behind him was painful and asked
to be handcuffed in front.  Further,
despite Officer Evans=s testimony that a person=s going to sleep because he is tired
is, in her opinion, the same thing as passing out, I cannot agree that lying
down is the same thing as passing out. 
The two are quite different.








There is no record of the alcohol concentration in Appellant=s body at the time he was
driving.  The only record of the alcohol
concentration in Appellant=s body was made more than an hour and
a half after he stopped driving, and that record was made after he had vomited.[8]  It is common knowledge that even burping can
invalidate intoxilyzer test results.[9]  Officer Evans testified that if a person
burped or vomited during the fifteen-minute observation period before beginning
the intoxilyzer test, the observation period had to begin again, although she
did not know why.  I would submit that the
observation properly begins again only if no residue of vomit is left in the
mouth.  As long as there is residue of
the vomit, the testing cannot be said to be wholly reliable.  And the majority may be correct that if a
valid test reveals a breath alcohol level of .09, that is some evidence there
was alcohol in the body when the subject was driving.  But, realistically, if, at the time the test
is performed, there is no evidence to show whether the body was in the
absorption mode or the dissipation mode, there is no way to tell whether the
alcohol concentration in the body was higher, lower, or the same when Appellant
was operating his truck.  In this case,
there is the additional problem of Appellant=s having vomited and no evidence that the vomit residue had
been cleared from his mouth when he breathed into the tube of the
intoxilyzer.  As the majority points out,
no one attempted to prove Appellant=s blood alcohol level at the time he was operating the
vehicle.

The issue is not whether Appellant could properly be cited for a traffic
violation or whether there was some evidence that would allow a jury to suspect
that he had been drinking, but whether the State proved beyond a reasonable
doubt that he was intoxicated when he operated the vehicle.  The State did not.

For these reasons, I cannot join the majority=s well-written opinion and must
respectfully dissent.

 

LEE ANN DAUPHINOT

JUSTICE

 

PUBLISH

DELIVERED:
March 4, 2010











[1]Officer Brown explained that the Fort Worth Police
Department=s DWI Unit handles only DWIs and that, although he is
qualified to investigate DWIs, the DWI Unit can process them in Ahalf the
time we can, just all the paperwork, being familiar with it.@





[2]The penal code defines Aintoxicated@ as Anot having the normal use of mental or physical
faculties by reason of the introduction of alcohol . . . into the body@ (the
impairment definition) or Ahaving an alcohol concentration of 0.08 or more@ (the
per se definition).  Tex. Penal Code Ann.
' 49.01(2) (Vernon 2003).





[3]Officer Brown explained at trial that the remainder of
the stop was not recorded because the videotape ran out of tape.





[4]The dissent contends that the videotape is contrary to
Officer Evans=s testimony and shows that Williams was not passed
out.  The videotape shows that Officer Evans
left the scene for the jail at approximately 2:05 a.m. and that Williams lay
down in the backseat at that time.  He
did not talk again or sit up until they arrived at the jail at 2:17 a.m., at
which time he asked the officer to stop so that he could throw up.  Thus, the videotape does not contradict
Officer Evans=s testimony that Williams was passed out.





[5]The dissent also asserts that the videotape
contradicts Officer Evans=s testimony about Williams=s
behavior in the intoxilyzer room.  We
find no contradiction between Officer Evans=s testimony and the videotape.





[6]The dissent takes issue with the fact that the video
recording of the stop began after Williams ran the red light, stopped before
Williams got out of his car, and did not include audio.  No evidence in the record suggests that the
videotape was not full or that Officer Brown intentionally turned off the
videotape before getting out of his car. 
Instead, Officer Brown testified that the video A[j]ust
ran out of tape@ and that he did not realize it until he Atook it
out and placed it into property.@  He also
testified that he did not recall if his patrol car that night was equipped with
a microphone but that if it had one, he would have been wearing it.  Any suspect motive on the part of the police
to which the dissent alludes is not supported by the record and is not an issue
raised in this appeal.  See Tex.
R. App. P. 47.1.





[7]The dissent claims that the evidence is factually
insufficient to show that Williams was intoxicated at the time he was driving,
but the evidence demonstrates that Williams ran a red light (a fact that he
admitted at trial), admitted drinking alcohol that night (also a fact that he
admitted at trial), lay down in the backseat of the patrol car (again, an
admitted fact), vomited upon arrival at the jail (yet again, an admitted fact),
and failed field sobriety tests and the intoxilyzer test.  Viewing the evidence in a neutral light,
favoring neither party, this evidence is certainly not Aso weak
that the factfinder=s determination is clearly wrong or manifestly unjust.@  See Lancon, 253 S.W.3d at 704.





[8]AExtrapolation
evidence explains the correlation between the breath test results and the level
of intoxication at the time of the arrest in a given case.@  Martin v. Dep=t
of Pub. Safety, 964 S.W.2d 772, 776
(Tex. App.CAustin 1998, no pet.).





[9]The court of criminal appeals issued its opinion in Kirsch
after Williams filed this appeal.





[1]RR Vol.II at 29B30.





[2]Wiede v. State,
214 S.W.3d 17, 24B25 (Tex. Crim. App. 2007); State v. Ross, 32
S.W.3d 853, 855 (Tex. Crim. App. 2000), modified on other grounds by State
v. Cullen, 195 S.W.3d 696 (Tex. Crim. App. 2006).





[3]No. 02-08-00388-CR, 2010 WL 520810, at *5, *7 (Tex.
App.CFort Worth, February 11, 2010, no pet. h.) (Dauphinot,
J., dissenting).





[4]295 S.W.3d 780, 785 (Tex. App.CFort
Worth 2009, no pet.) (Dauphinot, J., dissenting).  The reporter=s record in Helm contains the officer=s
testimony indicating that he was at the intersection of Marquita and Camp Bowie
when he observed Helm=s driving.





[5]See Tex.
Code Crim. Proc. Ann. art. 2.133B.135 (Vernon Supp. 2009).





[6]Fort Worth Crime Control and Prevention District Plan
Executive Summary FY 2010, IV.  Police Department
Enhancements, K. In-Car Video Cameras 10 (April 17, 2009),
http://www.fortworthgov.org/council_packet/render_file.asp?filename=11505/CCPD+Executive+Summary+CCPD+Budget+FY10.doc.





[7]See Tex.
Code Crim. Proc. Ann. art. 2.135.





[8]See 37 Tex.
Admin. Code ' 19.4.(c) (2006) (Tex. Dep=t of
Safety, Breath Alcohol Testing Regs.) (AAll breath alcohol testing techniques, in order to be
approved, shall meet, but not be limited to, the following: (1) a period during
which an operator is required to remain in the presence of the subject.  An operator shall remain in the presence of
the subject at least 15 minutes before the test and should exercise reasonable
care to ensure that the subject does not place any substances in the mouth.@); Heeth
v. State, No. 01-94-00975-CR, 1997 WL 212268, at *3 (Tex. App.CHouston
May 1, 1997, no pet.) (not designated for publication) (AIn the
present case, Deputy Whitley explained that the state requires officers to
observe a DWI arrestee for fifteen minutes prior to administering the
intoxilyzer test to make sure that he consumes no more alcohol, introduces no
other substances into his mouth, and does not vomit.  All of these acts would affect the results of
the intoxilyzer test.@).





[9]See, e.g., Pastrano
v. State, No. 04-95-00268-CR, 1996 WL 382983, at *1 (Tex. App.CSan
Antonio July 10, 1996, no pet.) (not designated for publication) (AThe
intoxilyzer expert testified that a burp which brought up liquid could affect
the results although a burp which only brought up vapor from the stomach would
have no effect.@); Hujar v. State, No. 01-94-00024-CR, 1995 WL
431503, at *4 (Tex. App.CHouston [1st Dist.] July 20, 1995, no pet.) (not
designated for publication) (AOfficer Jones testified that if a subject belched or
burped before a test it could bring up residual alcohol from the stomach and
cause a falsely high reading.  He
testified that if a subject burps, he must start the 15‑minute waiting
period over.@).